UNITED STATES, Appellee

v

JOHN W. LONG, Second Lieutenant, U. S. Army, Appellant

7 USCMA 265, 22 CMR 55

No. 8280

Decided August 17, 1956

*First Lieutenant Bert M. Gross* argued the cause for Appellant, Accused. With him on the brief was *Major Edwin Doran.*

*First Lieutenant Lewis W. Evans* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant William K. Davenport.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Lieutenant Long was tried by general court-martial at Stuttgart-Moehringen, Germany, upon three specifications embracing drunk and disorderly conduct in a public street; striking and kicking Corporal George W. Ohman, U. S. Army, a Military Policeman then in

the execution of such duties; and also striking and kicking one Manfred Marx, a person then in the execution of civil law enforcement duties. All of the offenses allegedly occurred in Straubing, Germany, during the early morning hours of July 24, 1955, and all were charged as violations of Article 134, Uniform Code of Military Justice, 50 USC § 728. The court-martial found him guilty of drunk and disorderly conduct as alleged, but excepted from the latter two specifications the words "a person then having and in the execution of military police duties" and "a person then having and in the execution of civil law enforcement duties," respectively, and found accused guilty in each instance of the lesser included offense of assault and battery under Article 128, Uniform Code of Military Justice, 50 USC § 722. He was sentenced to dismissal from the service and forfeiture of all pay and allowances, which stands approved by the convening authority, and affirmed by a board of review in the office of The Judge Advocate General, United States Army. We granted accused's petition for further review on the sole issue:

"Whether the law officer was required to instruct the court that if they found the officers were not in the execution of police duties, the accused had the right to use reasonable resistance to free himself from unlawful restraint."

The facts are that on the morning in question a Military Police patrol was engaged in a routine surveillance of local drinking establishments in Straubing. This patrol was composed of Corporal Ohman in charge, Private Liberty and German City Policeman Manfred Marx. The presence of one civil policeman on these patrols results from a long-standing arrangement between the German Chief of Police and the Chief of the Military Police of the Straubing sub-area. Among other functions of the members of these patrols, it is their duty to remove from the public eye as diplomatically as possible and return to their units any members of our armed forces—including officers as well as enlisted persons—who are discovered asleep or "passed out" in public places. Should any violence or other embarrassment occur in so doing, the patrol members were instructed to call the Military Police Duty Officer to the scene.

The Regina Gasthaus was frequented by enlisted personnel, as were apparently all such places in Straubing, and had a reputation as one of the "hot spots" of the city. At about 2:20 o'clock on the morning in question, which was near closing time, Corporal Ohman's patrol entered the Regina and observed the accused in civilian clothes sitting on a stool with his head resting upon the bar, apparently asleep. The German barmaid informed the members of the patrol that he was an officer and requested them to remove him from the premises. Efforts to awaken accused by shaking him and speaking to him in a loud tone of voice failed, whereupon Corporal Ohman and Private Liberty stood him on his feet. Accused's eyes remained closed and his legs were very "wobbly," so the two Military Policemen carried him down the stairs to the street, where efforts to awaken him failed. The sole purpose of the patrol at this phase of the incident was to revive accused to the point where he could be placed in a cab and sent back to the post. It was then decided to take accused in the patrol's jeep around the corner to the Military Police Station for that same purpose.

Since Private Liberty was to drive the jeep, Corporal Ohman requested the assistance of City Policeman Marx in lifting accused into the vehicle. Ohman held accused under the arms while Marx held his feet. They placed his body on the right front seat of the jeep but as Ohman reached down to swing the accused's legs into the interior of the jeep the accused, who had remained completely limp with eyes closed, suddenly came to life, straightened up, and "came out swinging." Accused's fist connected with Ohman's stomach and knocked the wind out of him. Accused then started around the front of the jeep and the ensuing scuffle, during which both Ohman and Marx were kicked, carried all four participants to the opposite sidewalk. Ohman asked accused if he was an officer and

**267**

received an affirmative reply. He then asked to see his AGO card and accused stated in substance that he would only show it to another officer. Ohman then informed accused that he was under apprehension and was requested to enter the jeep and proceed to the Military Police Station. Accused refused to go and "started swinging again." Since Private Liberty was at this precise moment out in the street engaged in retrieving caps and whistles dislodged during the previous struggle, City Policeman Marx assisted Ohman in again subduing the accused, who was then handcuffed. Private Liberty told accused that if he would conduct himself like an officer Liberty would remove the handcuffs, to which accused replied, "Take the handcuffs off, and I'm gone." Ohman then sent for the Provost Marshal, Captain Frew, who arrived within ten or fifteen minutes and terminated the incident by removing the handcuffs and persuading accused to enter the jeep and be driven by the patrol to the Military Police Station.

It was the opinion of Captain Frew and the three members of the patrol that accused was drunk. A blood alcohol test conducted at 4:00 o'clock that same morning indicated 1.4 milligrams per cubic centimeter. The certifying medical officer noted that accused had an odor of alcohol on his breath but showed no other indicia of intoxication.

Accused testified at considerable length, stating in substance that he had imbibed several beers and two drinks of cognac during the entire evening. He was positive that he was not intoxicated in the Regina bar but simply fell asleep, regaining consciousness when he was pushed into a strange vehicle by unrecognizable persons. Not knowing what was happening to him, and having no idea that he was being arrested or placed in apprehension, accused naturally fought his attackers. He did not realize what was going on until the hand irons were applied. He attributed his failure to grasp the situation to his awakening from a deep slumber, to the darkness of the street, and to his faulty eyesight without his glasses—which according to Government wit-

nesses were either removed in the bar to prevent possible loss or damage, or were dislodged during the scuffle in the street.

The law officer gave unimpeachable instructions upon the elements of the principal, as well as lesser included, offenses. He specifically and correctly covered the principles of (1) intoxication as it might affect accused's knowledge that the policemen were in the execution of their official duties, and (2) the honest though mistaken belief of accused that he was possibly being assaulted or mishandled by unknown individuals and was not aware of his surroundings. Defense counsel had no objections to the instructions as given and signified that he had no request for any additional instructions.

Defense counsel deliver a two-pronged argument to support their position that the members of the patrol acted illegally when they assumed "protective custody" of the accused. They concede that there is some evidence indicating that the policemen were in the execution of their offices but point out the necessity that there be only credible evidence to the contrary, that the officers were not acting in an official capacity, in order to place upon the law officer the responsibility of giving the instruction in question. Certain purported vagaries, contradictions and ambiguities in the testimony of Marx and Captain Frew are cited as credible evidence sufficient to raise the issue. However, the members of the patrol seemed to have no doubt concerning their respective duties as such, and the following testimony of Captain Frew, the Military Police Duty Officer, elicited through questioning by a court member, stands uncontroverted in any respect: ·

"Q. What I am trying to get at is, here is a case of somebody sleeping in a bar, purportedly an officer, and your MP's took over, and they are supposed to help people.

A. Well, I would answer it in this way, sir. After getting an individual outside and they are trying to help him, and they put him into a vehicle, into a jeep, if he slugs one of those

MP's, of course they have got to protect themselves, or if he kicks one of them, and he will not be brought under control once he is aroused to that degree and he must be handcuffed, and they have any reason to believe he is an officer, the Duty Officer is called.

Q. Now, my second question is this: What instructions do you give your men relative to Germans handling Americans? What are they supposed to do? What is the purpose of their being there?

A. We have a combined patrol, sir.

Q. Right.

A. And where at all possible the Military Police handle the service personnel.

Q. Where at all possible?

A. Yes, sir. If they can't handle them themselves, they have the assistance of the civil policeman.

Q. Let's take this case where you have someone you are trying to help, trying to awaken, and to help out, so you take him out and try to walk him, and you have—what's the composition of this patrol?

A. We have to [sic] Military Policemen and one civilian policeman.

Q. And it takes two men to take care of holding the man and trying to walk him and wake him up. Who is supposed to be on either side? What two men?

A. There are no standing instructions on that, sir. If he is very uncooperative, sir, the German police— in that case they will give a helping hand.

Q. In other words, anybody could put his hands on the man they are trying to help?

A. Yes, sir, assisting him.

Q. Assisting him?

A. Yes, sir."

Upon the other prong of their argument defense counsel contend that under the provisions of Circular No. 633-20, Apprehension, Search, and Seizure, Headquarters United States Army, Europe, July 6, 1955, the German Civil Policeman was barred from acting because (1) Military Police were available, and (2) he had not been requested to apprehend by an authorized American commander, as provided in the Circular. Defense counsel further assert that no evidence was adduced to indicate the extent of a German policeman's civil law enforcement duties. It appears to us that Circular 633-20 was promulgated to regulate the conduct and delineate the authority of German Law Enforcement Agencies, *acting independently as such,* to arrest members of our forces, and is inapplicable to the instant situation where Marx was lawfully present in conjunction with an American Military Police patrol. Assuming *arguendo* that the Circular does apply in this case, the record shows that all Military Police patrols in Straubing—through a long-standing agreement between Straubing's Chief of Police and the American Military Police Commander—are comprised of one German civil policeman and two American Military Policemen, and that each may assist the other in cases where violent reactions or other emergencies are encountered. Thus Marx's very presence as a member of such a Military Police patrol would constitute the authority of "an authorized American commander" required by Circular 633-20, supra, and in this case Corporal Ohman, leader of the patrol, specifically requested the assistance of Marx.

Article 7 of the Uniform Code of Military Justice, 50 USC § 561, treats the subject of "Apprehension" in the following manner:

"(a) Apprehension is the taking into custody of a person.

"(b) Any person authorized under regulations governing the armed forces to apprehend persons subject to this code or to trial thereunder may do so upon reasonable belief that an offense has been committed and that the person apprehended committed it.

"(c) All officers, warrant officers, petty officers, and noncommissioned officers shall have authority to quell all quarrels, frays, and disorders among persons subject to this code and to apprehend persons subject to this code who take part in the same."

Paragraph 19*a*, Manual for Courts-Martial, United States, 1951, amplifying

the foregoing Article, provides in pertinent part that:

"Petty officers, noncommissioned officers, and enlisted persons performing police duties should apprehend a commissioned or a warrant officer offender only pursuant to specific orders of a commissioned officer, except where such action is necessary to prevent disgrace to the service, the commission of a serious offense, or the escape of one who has committed a serious offense. In all cases involving the apprehension of officers and warrant officers by petty officers, noncommissioned officers, and enlisted persons performing police duties, the individual effecting the apprehension will, immediately after such apprehension, notify the officer to whom he is responsible or an officer of the air police, military police, or the shore patrol."

There is nothing vague or ambiguous about these provisions. Defense counsel argue that the mere falling asleep of a member of our forces, attired in civilian clothes, in a public bar is not disgraceful or disorderly conduct. The accused is a commissioned officer, known to be such by the German barmaid, in a locale frequented by enlisted personnel. Certainly uninformed spectators would consider that he was drunk and "passed out" rather than asleep. If he was only asleep, he chose as his couch the public bar of the second "hottest spot" in Straubing. We believe the patrol had a right to remove him from the public view. As explained by all members of the patrol, the sole purpose at that point was to arouse the sleeper in order to ascertain his name, rank, and station, so that he could be sent back to his post. Not until the affray in the street had terminated was "apprehension" as such considered—and at that point Corporal Ohman complied with the terms of the Manual by immediately summoning Captain Frew to the scene. The specification under which the charge was laid does not allege any disorderly conduct in the bar proper, but only in "a public street in Straubing."

Viewing the evidence in this case through the spectacles of the law officer, we are unable to say as a matter of law that he abused his discretion in failing *sua sponte* to give the instruction encompassed in the framed issue. United States v Beasley, 3 USCMA 111, 11 CMR 111.

We see no substantial inconsistency in the findings of the court-martial due to the fact that, acting in conformity with the instructions on intoxication, the court might well have concluded that accused was too drunk to know he was assailing Military Policemen then in the execution of their duties. This being so, the most appropriate method by which the court could reduce the principal offense to that lesser included under Article 128 would be to employ the very exceptions which it used.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.