UNITED STATES

v.

Captain Michael A. JOHANNS, 001–46–5650 FR, United States Air Force.

ACM 23699.

U.S. Air Force Court of Military Review.

Sentence Adjudged 2 July 1982.

Decided 26 Oct. 1983.

Appellate Counsel for the Accused: Ms. Mary Louise Frampton, Fresno, California, Colonel George R. Stevens and Captain Kathleen G. O'Reilly.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert, Major Michael J. Hoover and Captain Brenda J. Hollis.

Before HODGSON, FORAY, HEMINGWAY, KASTL, CANELLOS, RAICHLE, MILLER and SNYDER, Appellate Military Judges, En Banc.

### DECISION

CANELLOS, Judge:

The accused was convicted, contrary to his pleas, of adultery and of four specifications of conduct unbecoming an officer and a gentleman by having sexual relations with three female enlisted members (one of them married), and by sharing a bed with the married woman while she was intoxicated.[1] The "conduct unbecoming" specifi-

---

1. The charges upon which the accused was arraigned were:

Charge I: Violation of the Uniform Code of Military Justice, Article 133, 10 U.S.C. § 933.

Specification 1: In that CAPTAIN MICHAEL A. JOHANNS, United States Air Force, 91st Strategic Missile Wing, did, at Minot Air Force Base, North Dakota, on or about 5 October 1981, wrongfully, dishonorably, and disgracefully have sexual intercourse with Donna R. R., Sergeant, United States Air Force, the said Sergeant Donna R. being, at that time, the lawful wife of an active duty enlisted member of the United States Air Force, contrary to the customs and traditions of the armed forces of the United States.

Specification 2: In that CAPTAIN MICHAEL A. JOHANNS, United States Air Force, 91st Strategic Missile Wing, did, at Minot Air Force Base, North Dakota, on or about 8 October 1981, wrongfully, dishonorably, and disgracefully fraternize and associate on terms of military equality with enlisted members of the United States Air Force, to wit: Sergeant Donna R., by going into the military quarters of the said Sergeant Donna R. at Minot Air Force Base, North Dakota and sharing the same bed with the said Sergeant Donna R. while the said Sergeant Donna R. was the lawful wife of an enlisted member of the United States Air Force, contrary to the customs and traditions of the armed forces of the United States.

Specification 3: In that CAPTAIN MICHAEL A. JOHANNS, United States Air Force, 91st Strategic Missile Wing, did, at Minot, North Dakota, on three or four separate occasions during September, 1981, wrongfully, dishonorably, and disgracefully fraternize and associate on terms of military equality with Staff Sergeant, then Sergeant, Sheryl K., a female active

cations are couched in terms that the accused did "dishonorably and disgracefully *fraternize* and associate on terms of military equality with enlisted members of the United States Air Force." (emphasis added).

The approved sentence extends to dismissal from the service.

On appeal, the accused claims that (1) the court lacked jurisdiction over the adultery, charged as a violation of Article 134, U.C.M.J.[2], 10 U.S.C. § 934, since he did not violate North Dakota law and his conduct therefore did not discredit the armed forces, (2) Article 133, U.C.M.J.[3], is void for vagueness as it applies to fraternization, (3) he was tried on the basis of selective prosecution, and (4) the ban on fraternization abridges his right to freedom of association.

The facts are not in dispute. The accused was a single, 28 year old missile combat crew commander who had been stationed at Minot Air Force Base, North Dakota, since completion of training in 1978. The Officers' Open Mess at Minot was being redecorated; as a result, officers had been authorized to utilize the facilities of the Noncommissioned Officers' Open Mess. The accused availed himself of the opportunity

and socialized at the NCO Club. There he met Sgt R. (who was married), SrA P. and SSgt K. He dated each and ultimately had sexual relations with them all. On one occasion, the accused and Sgt R. went on a date downtown, and thereafter returned to her house on base. Sgt R. was intoxicated and therefore remembers nothing other than the next morning the accused was asleep next to her in her bed.

All this interaction was completely consensual, private, nondeviate, and sometimes instigated by the women involved. The accused was neither the commander nor supervisor of any of these enlisted members, and their respective relationships were not publicized.[4] In the opinion of the enlisted women, the accused's activities were neither dishonorable nor service discrediting. The charges resulted from these apparently private, voluntary liaisons.

I

We affirm the conviction of the offense of adultery. Adultery, although seldom prosecuted, is a viable offense subject to trial by court-martial. *See generally United States v. Butler,* 5 C.M.R. 213 (A.B.

---

duty enlisted member of the United States Air Force, by engaging in acts of sexual intercourse with the said Staff Sergeant, then Sergeant, Sheryl K., contrary to the customs and traditions of the armed forces of the United States. Specification 4: In that CAPTAIN MICHAEL A. JOHANNS, United States Air Force, 91st Strategic Missile Wing, did, at Minot Air Force Base, North Dakota, on two or three occasions, during November, 1981, wrongfully, dishonorably, and disgracefully fraternize and associate on terms of military equality with Senior Airman Michelle P., then known as Senior Airman Michelle S., a female active duty enlisted member of the United States Air Force, by engaging in acts of sexual intercourse with the said Senior Airman Michelle P., then known as Senior Airman Michelle S., contrary to the customs and traditions of the armed forces of the United States.
Charge II: Violation of the Uniform Code of Military Justice, Article 134.
Specification: In that CAPTAIN MICHAEL A. JOHANNS, United States Air Force, 91st Strategic Missile Wing, did, at Minot Air Force Base, North Dakota, on or about 5 October 1981, wrongfully have sexual intercourse with Donna R., a married woman, not his wife.

**2.** Art. 134. General article
Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court.

**3.** Art. 133. Conduct unbecoming an officer and a gentleman
Any commissioned officer, cadet, or midshipman who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct.

**4.** It was stipulated at trial that the allegations were brought to the attention of the accused's commander by a member of his squadron on the basis of inferences he drew from conversations with the accused.

R.1952); *United States v. Neville,* 7 C.M.R. 180 (A.B.R.1952).

The accused claims that under the law of North Dakota he did not commit adultery; however, it is the military law which defines the parameters of the offense of adultery, not state law. *United States v. Panchisin,* 30 C.M.R. 921 (A.F.B.R.), *pet. denied,* 31 C.M.R. 314 (1961). It is not required to show that the accused was married; rather, it is sufficient to show that either of the participants was married to a third party. *United States v. Melville,* 8 U.S.C.M.A. 597, 25 C.M.R. 101 (1958), *United States v. Hedgecock,* 30 C.M.R. 624 (N.B. R.1960).

Accordingly, we are convinced that the accused is guilty of the adultery as charged. The evidence clearly establishes that the accused had sexual relations with a woman, not his wife. The woman was an enlisted member of the United States Air Force, married to a noncommissioned officer on the same base. An officer having sexual relations with the wife of an enlisted member clearly acts in a manner prejudicial to good order and discipline under Article 134, U.C.M.J.[5]

Having determined that the accused's conduct amounted to actionable adultery, we further find, on these facts, that he was culpable of conduct unbecoming an officer and a gentleman for such acts.

## II

We next turn our attention to the four offenses bottomed on "fraternization". It is propounded by the Government that there is in the United States Air Force a custom which proscribes unlawful fraternization and makes actionable the association of officers with enlisted personnel on terms of military equality. We find that at the time of the offenses in issue, there did not exist a clearcut standard for gauging so called "fraternization" in the Air Force; as a result, alleged violations grounded on fraternization are not actionable under the U.C.M.J.

We begin with an historical review of the offense of fraternization. Prior to its becoming a separate service, the Air Force was, of course, a part of the U.S. Army. There supposedly existed in the Army a custom of the service that officers and enlisted personnel would not associate together in mutual social activities. However, during World War II, dating between officers and enlisted personnel was commonplace, and if there were any restrictions against such interaction, they were not enforced. *See generally* Treadwell, *The Women's Army Corps,* in UNITED STATES ARMY IN WORLD WAR II (1954). This type of dating apparently did not adversely affect morale and discipline. J. HOLM, WOMEN IN THE MILITARY, AN UNFINISHED REVOLUTION (1982).

When it became a separate service, the Air Force proclaimed that officers and airmen would not *generally* associate together in social activities; this more progressive attitude was consistent with the less formal atmosphere existing in the Air Force, as compared with the Army. *See generally* Flatten, *Fraternization,* 10 A.F. Reptr. 109 (1981). Since that time, the Air Force has promulgated rules which authorize certain activities on the part of Air Force personnel, including those dealing with housing and messing, which contravene a strict application of what was supposedly a customary prohibition against fraternization.

A booklet on Air Force standards was published in 1977. It did not discuss fraternization, but did provide:

Since we live and work in a very close environment and endure common hardships, officer and enlisted personnel frequently develop close personal friendships. However, friendships must not in-

---

**5.** It is unnecessary to show that the conduct of the accused was also of a nature to bring discredit upon the armed forces, this being an alternate method of proving a violation of Article 134, U.C.M.J.

terfere with judgment or duty performance.[6]

Within the last decade, the directive governing the assignment of on-base family quarters was changed to authorize officers who were married to enlisted members to reside on base, with an option to select whether they resided in officer or enlisted housing.[7] Prior to that time, such a married couple would not have normally been authorized to reside on base because such was not considered to be in the best interests of the Air Force.[8] The regulations governing the operations of the Open Messes were changed to permit officers and enlisted personnel to patronize each other's clubs as guests.[9] Traditionally, such patronage was restricted.[10]

In addition, the Air Force has fostered management principles which encourage close interpersonal relationships at the expense of the strict, customary distinction between officers and airmen.

The reported cases dealing with the subject of fraternization have been few and far between. They include: a U.S. Army officer convicted of inviting an enlisted man to his tent, offering him liquor and then making homosexual advances towards him;[11] a U.S. Marine officer convicted of inviting an enlisted man to his room on base where he gave him liquor and made homosexual advances;[12] a U.S. Navy officer convicted of taking an enlisted man to the Officers' Club, then to his room on base and there committing acts of sodomy.[13] In that case, the Court of Military Appeals recommended that actions violative of the custom against fraternization should be included in an appropriate regulation so that adequate notice is given to all potential violators. A U.S. Navy officer was convicted of bringing an enlisted man into his apartment to live, and there committing acts of sodomy with him.[14] One Judge of the U.S. Court of Military Appeals recommended that violations of this type be handled by administrative means. A U.S. Army warrant officer was acquitted of rape, but convicted of drinking with three enlisted personnel, taking them to his house, where he bathed one female and had sexual relations.[15] A U.S. Army noncommissioned officer was convicted of sleeping in the barracks with two enlisted members whom he supervised as first sergeant.[16] A U.S. Army officer was convicted of committing adultery with an enlisted woman in his chain of command, during duty hours, in the barracks.[17] Finally, this Court, in an unpublished decision, held that an officer who provided drugs to

---

6. A.F.R. 30–1, Air Force Standards, 30 Sept 77, para 4b.

7. A.F.R. 90–1, Assignment of Family Housing, 19 Dec 77, Table 6–4.

8. A.F.R. 30–6, Occupancy of Public Quarters, 7 Feb 57, para 16c.
IF ONE SPOUSE IS AN OFFICER OR WARRANT OFFICER, AND THE OTHER IS AN ENLISTED PERSON, assignment to family-type public quarters is not considered to be in the best interest of the service, and such assignment will not normally be made. In this case, both members will be permitted to reside jointly off the base, regardless of the availability of public quarters for their occupancy.

9. A.F.M. 215–11, Operation of Open Messes, 9 Oct 79, para. 1–11a(2).
Officer and enlisted open mess members may use one another's open mess as guests... The degree to which such privileges are extended or encouraged is a local decision based on membership desires, space limitations, social commitments, and other morale or protocol considerations.

10. A.F.M. 176–3, Operations Manual for Open Messes and Other Sundry Nonappropriated Funds, 12 May 71.

11. United States v. Livingston, 8 C.M.R. 206 (A.B.R.1952).

12. United States v. Free, 14 C.M.R. 466 (N.B.R. 1953).

13. United States v. Pitasi, 20 U.S.C.M.A. 601, 44 C.M.R. 31 (1971).

14. United States v. Lovejoy, 20 U.S.C.M.A. 18, 42 C.M.R. 210 (1970).

15. Staton v. Froehlke, 390 F.Supp. 503 (D.D.C. 1975).

16. United States v. Horton, 14 M.J. 96 (C.M.A. 1982) (rev'd on other grounds).

17. United States v. Jefferson, 14 M.J. 806 (A.C. M.R.1982).

her subordinates, and then used drugs with them, could be convicted of unlawful fraternization; however, because of an instructional failure, the conviction as to that specification was disapproved.[18]

In all of these reported cases, some aberrant conduct was in evidence; homosexual activity, alleged rape, supervisors seeking sexual favors from their subordinates and performing indecent acts before others. Notably absent from the opinions in the cited cases is any discussion of voluntary, private, non-deviate sexual activity between of-age officer and enlisted members, who were not associated with one another in any way on duty.

After this review of history and case law, we address the immediate question. To assist us, the Government, in its able oral argument, asks this Court to declare that mere dating between officers and airmen violates custom; that non-deviate, consensual and private sexual intercourse between them violates custom; and finally that marriage between them violates custom, but is a "fait accompli" against which the Government, yielding to a higher priority, chooses to take no action.

We expressly refuse to so declare. If there exists a customary ban on fraternization, and the avowed reason for such a custom is that fraternization is inimical to good order and discipline in the armed forces, how then could marriage change that effect? In our opinion, the situation would appear exacerbated by the closer relationship spawned by the marriage.

■ Whether the present situation is good or bad for overall readiness is not the issue before this Court. Rather we must measure the accused's alleged *criminal* conduct against the "real world" in which all-ranks housing and messing, and officer-enlisted marriages are currently authorized. Given such practices, authorized by regulation, we cannot say that seeing each other socially and dating is *criminal* conduct.

Furthermore, once it is acceptable to have officers married to enlisted members, it is logical to conclude that mere dating is also acceptable, since that is nothing more than the socially accepted preliminary stage to such marriages. Also using our common sense and knowledge of human nature and the ways of the world, we note that it is not an uncommon practice for men and women who are dating, with or without marriage in sight, to engage in sexual relationships; in contemporary society such a practice is not considered immoral or unusual.

### III

We close our discussion by examining the aspect of the crimes charged which is premised on conduct unbecoming an officer and a gentleman under Article 133, U.C.M.J. Because the words thereof are so broad, it is argued by the accused that the standard set thereby is ambiguous, and the Article fails for vagueness. *See generally* Nelson, *Conduct Expected of an Officer and a Gentleman: Ambiguity*, 12 JAG L.Rev. 124 (1970). Despite this, the United States Supreme Court has held that the Article is not facially vague; therefore, an officer may be punished thereunder for offenses that he has "no reasonable doubt . . . were both 'unbecoming an officer and a gentleman' and 'to the prejudice of good order and discipline in the armed forces.'" *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

■ In the evolution of the "Void for Vagueness Doctrine," this rule has emerged: To satisfy the requirements of the Due Process Clause of the U.S. Constitution, a criminal statute must clearly spell out the activity being proscribed so that persons of reasonable intelligence can understand the expected conduct and thereafter conform their conduct to it. Any statute which fails to accomplish this is void. *United States v. National Dairy*

18. *United States v. Rodriguez,* ACM 23545, (A.F.C.M.R. 29 October 1982) (Judge Miller concurring in result, and finding that the Air Force regulations "have not only terminated the existence of the custom [against fraternization], but also the offense that was once chargeable as a violation of that custom.")

*Products,* 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).

■ Customs of the service can clarify the general article and help define the standard expected. In order to qualify as such, a custom must be uniform, a known practice of long standing, certain and reasonable, and not in conflict with existing statutes or constitutional provisions. *See* Winthrop, *Military Law and Precedents,* 42 (2d ed. 1920 reprint). Likewise, non-usage may eliminate a previously well-established custom. M.C.M., 1969 (Rev.), para. 213*b.* As we discussed earlier, the standards and customs of the prior day, not memorialized by regulation, are no longer effective as such. In the context of the offenses charged here, rather than solving the vagueness problem inherent in the general articles through the use of customs of the service, the vagueness becomes even more pronounced; this is so because the customs themselves are unwritten and vague. *See generally* Nelson, *supra.*

■ Looking at the issues from another viewpoint, Congress never intended to regulate the wholly private moral conduct of an individual servicemember under the general articles. *United States v. Snyder,* 1 U.S.C. M.A. 423, 4 C.M.R. 15 (1952). Therefore, it has been consistently held that fornication in the absence of aggravating factors is not an offense under military law. *United States v. Snyder, supra; United States v. Berry,* 6 U.S.C.M.A. 609, 20 C.M.R. 325 (1956); *United States v. Wilson,* 32 C.M.R. 517 (A.B.R.1962). Sharing a bed with a woman without proof of sexual intercourse, is also not an offense absent such aggravating factors. *United States v. Prater,* 5 B.R. & J.C. 228 (1950).

**19.** "... To constitute therefore the conduct here denounced, [unbecoming an officer and gentleman] the act which forms the basis of the charge must have a double significance and effect. Though it need not amount to a crime, it must offend so seriously against law, justice, morality or decorum as to expose to disgrace socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession

■ It is the nature of the acts themselves, the place where they occur, the presence or absence of other people, the military relationship between the officer and the enlisted member, and the likely effects of the incident on the attitude of the enlisted member and others present which are all important in determining whether sexual acts between officers and enlisted members are unlawful. *United States v. Jefferson,* 14 C.M.R. 806 (A.C.M.R.1982); Murphy, *The Soldier's Right to a Private Life,* 24 Mil.L. Rev. 97 (1964).

■ With this background on fraternization and conduct unbecoming an officer, we consider the facts of this case on its merits. Clearly the acts of fornication with SrA P. and SSgt K. had no attendant exacerbating circumstances. They were voluntary, private and non-deviate. If the accused had been an enlisted man, he clearly would not have been culpable.

■ Concededly, officers are held to a higher standard of conduct than enlisted personnel, and their conduct should be exemplary. However, an act should not be labelled as *criminal* if committed by an officer but innocent when committed by an enlisted person, especially when a critical question turns on an interpretation of the law. *United States v. Claypool,* 10 U.S.C. M.A. 302, 27 C.M.R. 376 (1959).

The only basis for finding the accused culpable for these offenses is that his status as an officer, coupled with the enlisted status of the women, made the acts wrongful. In order to sustain that finding, we must conclude that the acts themselves were criminal because of their surrounding circumstances.[19] This we find not supportable by the evidence.[20]

which he represents." Winthrop, *Military Law and Precedents,* 711–712 (2d Ed., 1920 reprint).

**20.** The accused was concerned that his amorous involvements with enlisted women could be wrong. As a result, he consulted his supervisor, Col. W., who told the accused that, in his opinion, it would be actionable fraternization if the accused dated enlisted women. Col W. admitted that he was not sure if this were the Air Force policy, however it was clearly his

We specifically find that as a matter of fact and law the custom in the Air Force against fraternization has been so eroded as to make *criminal prosecution* against an officer for engaging in mutually voluntary, private, non-deviate sexual intercourse with an enlisted member, neither under his command nor supervision, unavailable.[21]

Accordingly, only so much of the findings as finds the accused guilty of committing adultery, as alleged in Charge II, and of conduct unbecoming an officer for the conduct attendant thereto, as alleged in Specification 1 of Charge I, is affirmed. The remaining findings of guilty are set aside and are dismissed. The sentence is set aside. A rehearing on the sentence is ordered.[22]

KASTL and HEMINGWAY, Senior Judges and RAICHLE, Judge, concur.

FORAY, Senior Judge, not participating.

HODGSON, Chief Judge (concurring in part and dissenting in part):

The majority has held that an unmarried officer who has sexual relations with an unmarried enlisted subordinate is neither guilty of improper fraternization nor of conduct unbecoming an officer and a gentleman. I respectfully but adamantly disagree.

Until our decision today the military services had not broken ranks on the issue of whether fraternization is an offense punishable under the Uniform Code of Military Justice. *United States v. Rodriquez,* ACM 23545 (A.F.C.M.R. 29 October 1982); *United States v. Jefferson,* 14 M.J. 806 (A.C.M.R. 1982); *United States v. Rosario,* 13 M.J. 552 (A.C.M.R.1982); *United States v. Livingston,* 8 C.M.R. 206 (A.B.R.1952); *pet. denied* 8 C.M.R. 178 (C.M.A.1952); *United States v. Lovejoy,* 41 C.M.R. 777 (N.C.M.R.1969); *United States v. Free,* 14 C.M.R. 466 (N.B.R.1953). Further both the Court of Military Appeals and the federal courts have held fraternization to be a unique military offense. *United States v. Pitasi,* 20 U.S.C.M.A. 601, 44 C.M.R. 31 (1970); *United States v. Lovejoy,* 20 U.S.C.M.A. 18, 42 C.M.R. 210 (1970); *see also United States v. Horton,* 14 M.J. 96 (C.M.A.1982); *Staton v. Froehlke,* 390 F.Supp. 503 (D.C.Cir.1975).

Notwithstanding a sizeable body of law to the contrary, the majority has concluded that the prohibition against *improper* fraternization no longer exists as an offense within the Air Force. My colleagues accurately point out many areas in which the Air Force has fostered the growth of close friendships between officer and enlisted ranks, and, through its own regulations, created circumstances that could be viewed

opinion. When pressed by the accused, Col W. gave the accused a copy of the article written by Colonel Flatten, referred to herein, and told to read it since it explained Air Force policy. Our reading of this article reveals that the author believes there is no longer a violation of custom for an officer to "fraternize" with an enlisted member, so long as they have no command or supervisory relationship.

Further, testimony at trial from a former wing commander at Minot AFB, indicated that "fraternization" was common on the base.

21. We do not by this opinion indicate our personal assessment of the moral implications of the conduct described above. We certainly do not mean to imply that the conduct was model, nor that it should be condoned. As recognized earlier, situations of this type may best be handled by administrative means. Also, we recognize that a stricter rule on fraternization may be required and desirable. This could be done by appropriate service regulation.

We note that the dissenting judges all assert, without citation of *relevant* precedent, that the activities of the accused were of the type to be prejudicial to good order and discipline. We discern no bedrock authority for such conviction and we conclude that it is based on their personal perceptions of what the standards ought to be, not on a careful analysis of what the standard is in the United States Air Force today.

We are a court of law and are charged with the responsibility of determining *existing* law and applying it to the facts of a case. It is not part of our duty to conceal what is so or to engage in wishful thinking that the policy ought to be different. In short, we are not a policy making body-such authority reposes in those authorized policy making powers (command).

22. The Government's Motion To File Documents is, DENIED.

as eroding fraternization as prohibited conduct.

Like Judge Snyder, I cannot logically reconcile the Air Force's position that fraternization that blossoms into marriage is acceptable, while that which continues at a less committed level is wrong. However, I can more readily accept this "pocket of *de facto* immunity" resulting from marriage than I can the erosion of discipline that, in my view, will result from the elimination of fraternization as an offense.

The prohibition against fraternization by officers with enlisted members is based on preserving military discipline, not social inequality. *United States v. Livingston, supra.* There is merit in the bromide that "familiarity breeds contempt." In the context of a military community, orders are to be obeyed, not discussed in the light of the personal relationship between the person giving the order and the individual expected to obey it. Thus it is the time, the place, and the circumstances which dictate the propriety of the relationship between officer and enlisted members. *United States v. Free, supra.* The prohibition against fraternization within a military organization serves a valid and necessary purpose in maintaining good order and discipline. *United States v. Pitasi, supra; United States v. Lovejoy, supra.* Accordingly, in my opinion fraternization remains an offense within the Air Force and is punishable under appropriate circumstances.

Finally, assuming, *arguendo,* that fraternization no longer exists as an offense within the Air Force, the accused's conduct with female enlisted subordinates clearly amounts to conduct unbecoming an officer and a gentleman. The majority concludes that since the alleged acts, if committed by an enlisted member would not invoke criminal sanctions, the accused officer therefore, lacks culpability. I cannot accept this premise. A higher standard of conduct is required in law of an officer than is required of others. *United States v. Means,* 10 M.J. 162 (C.M.A.1981); *United States v.*

*Parini,* 12 M.J. 679 (A.C.M.R.1981). The Supreme Court of the United States has stated on several occasions that a military officer holds a position of special trust and responsibility. *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). Senior Judge Hemingway concurring in *United States v. Newak,* 15 M.J. 541, 545 (A.F.C.M.R.1982), made clear the expected standard. He wrote:

> Commissioned officers have a special responsibility to conduct themselves in a manner that promotes *discipline, obedience* and *respect.* That responsibility cannot be checked at the gate on the way home at the end of the duty day. [Emphasis added]

An officer who has sexual relations with an enlisted subordinate has acted in a manner that is totally incompatible with promoting discipline, obedience and respect. *See generally United States v. King,* 16 M.J. 990 (A.C.M.R.1983). This erosion of discipline is as true regarding the officer's sexual partner as for other military members who invariably hear of the encounter.

For these reasons, I must with deference dissent from Parts II and III of the principal opinion.

SNYDER, Judge (concurring in part and dissenting in part):

I fully concur with the holding that the accused's sexual relations with the wife of an enlisted member constitute conduct palpably prejudicial to good order and discipline. Such conduct does not require sophisticated analysis in order to reveal its adverse impact on discipline and morale, especially in light of the fact that military members are frequently required to be absent from their home base for lengthy periods.[1]

However, I dissent from the majority's conclusion that the accused's sexual liaisons with three enlisted women did not consti-

---

1. The husband of the accused's partner was performing temporary duty outside the United States during the period of their amorous liaison.

tute conduct unbecoming an officer and gentleman. I will not belabor the reader with a point by point dissection of the majority opinion. Suffice it to say that it misses the mark.

Initially, I offer advice to those officers who may mistakenly read the majority opinion as *carte blanche* to embark upon indiscriminate activities with enlisted personnel of the opposite sex. In my opinion, the majority result means only that one may not be prosecuted under the U.C.M.J. for conduct similar to the accused's. Commanders retain the full array of administrative sanctions, including administrative termination of commissioned status.

The following quote from the majority opinion indicates the inherent fallacy of its conclusion:

> However, an act should not be labelled as *criminal* if committed by an officer but innocent when committed by an enlisted person .... (citations omitted)

That statement assumes that an officer is just like any other military member, although lip service is offered to the contrary.

The fact of the matter is officers are held to a higher standard of conduct; and, demanding that the standard be met can, will, and does result in an officer being held criminally accountable in situations where enlisted members' derelictions may be disposed of nonjudicially. This differential is recognized and sanctioned by the Court of Military Appeals. I offer the following excerpts from the Chief Judge's opinion in *United States v. Means,* 10 M.J. 162, 165 and 166 (C.M.A.1981).

> Even if appellant's officer status had been a principal factor-indeed, the decisive factor-in the convening authority's decision to refer the case to a general court-martial, appellant would still have no valid constitutional grievance.

\*     \*     \*     \*     \*     \*

We find nothing arbitrary about a commander's determination to take officer status into account in referring cases for trial by court-martial. Such an exercise of prosecutorial discretion is quite in line with the consistent recognition that commissioned officers in the Armed Services occupy a special position of trust and duty.

\*     \*     \*     \*     \*     \*

In short, the Armed Services comprise a hierarchical society, which is based on military rank. Within that society commissioned officers have for many purposes been set apart from other groups. Since officers have special privileges[2] and hold special positions of honor, it is not unreasonable that they be held to a high standard of accountability.

The essence of this principle is that whatever the environment, an officer always has the responsibility of conducting oneself as an officer—be it in a consolidated mess, as an *infrequent* guest at the noncommissioned officers' open mess,[3] or as a member of an intramural athletic team. The officer must ensure that undue familiarity does not develop. The fact that the Air Force encourages certain social intercourse in the pursuit of *espirit de corps* does not detract from this responsibility. However, the official encouragement of such limited intercourse has been misconstrued as a subtle acceptance of all types of relationships between officers and enlisted personnel. A close reading of policy releases on the subject will reveal that not to be the case. The individual responsibility of officers is always included.

OFFICER–ENLISTED MARRIAGES: It would be intellectually dishonest for me to even attempt to hypothesize a legally acceptable position on this anomaly. Suffice it to say that because of the system's implicit acquiescence, those who have joined

2. Many of the special privileges referenced by the Chief Judge are no longer a reality. I address this fact later in the opinion.

3. Note 9 of the majority opinion omits the following sentence from the referenced regula-

tory provision: "However, wearing the military uniform in such instances and repeatedly inviting members to one another's open mess is discouraged."

in such marriages enjoy a pocket of *de facto* immunity.[4] However, that is not an adequate explanation for the failure to take action, especially where the situation is known prior to the parties marrying. Obviously, such marriages have contributed to the turbulence surrounding the issue.

It is probably safe to say that if these marriages were not "accepted," or tolerated, the majority opinion could very well be the dissenting opinion. They raise a very fair question: Given their existence, why should one be prosecuted for dating an enlisted person? Perhaps the closest analogy is that failure to prosecute *all* offenders is no cause to immunize all. However, it should not escape the reader that the desire of others to emulate the conduct which led to those marriages is one possible example of the pernicious impact of officer-enlisted marriages.

The main reason for the post-World War II uncertainty which surrounds this topic continues to be the *misconception* that the doctrine is grounded on social or intellectual inferiority. Inferiority, perceived or otherwise, has absolutely no bearing on the issue. The only driving force is DISCIPLINE. Anyone who believes that a leader can mechanically assign a "friend" to unpopular or hazardous duty is unrealistic. Axiomatically, the troops will be highly aware of the duties assigned to an enlisted person(s) with whom an officer habitually associates or consorts. That is the prejudice to good order and discipline which the line between the ranks is meant to prevent; and an officer and a gentleman will endeavor to keep oneself on the appropriate side of that line.

At any rate, making the presence or absence of a supervisory relationship the determining test is also erroneous. Neat compartmentalizations and unit lines have a way of evaporating under combat conditions. An officer's authority and status transcends "unit lines of boundary." Otherwise, *e.g.*, where is the authority to correct a uniform or other violation of one not a member of the correcting officer's unit?

Because of the adverse impact on discipline, and the compromising position which ensues, I would hold that the accused's actions constituted conduct unbecoming an officer and a gentleman, and affirm all findings of guilty.

Although not necessary for the discussion of the issue before us, I feel compelled to make the following observations. The issue with which we wrestle in this case is not truly the problem. Captain Johanns and others like him are merely manifestations of the *symptoms* of a larger and pervasive problem, as is the increasing number of courts-martial involving officer accused. Young officers are assuming their rank without an understanding of the significance of receiving a commission from the President, or an appreciation of the special trust and responsibility which accompany the commission. To far too many, it is a pay grade rather than a status. But they do not bear the sole responsibility.

It is time for the Air Force's command echelon to squarely address the situation (and in a real sense it is a dilemma), and accept the fact that one reason for the dilemma's existence is the effort to increase the prestige of an increasingly educated enlisted corps.[5] Allowing the gradual erosion of many, if not all, of the trappings which once accompanied commissioned officer status has contributed to the problem. Why should one act differently if the system treats everyone identically?[6] The "vic-

---

4. Although a fair number of these marriages are the result of one of the parties thereto obtaining a commission after marrying, that fact does not resolve the issue or reduce the dilemma.

5. This is where the misconception concerning inferiority really raises its head. Since probably close to half, if not more, of the enlisted corps hold college degrees, the system cannot

be viewed as failing to recognize its talented people. Unfortunately, a significant degree of the prestige bestowed upon the top enlisted grades has been at the expense of the officer ranks—primarily the junior grades.

6. Assigning members in the top three enlisted grades to Visiting Officers Quarters (VOQ) and the blurring of the distinctions between offi-

tims" of this state of affairs are the company grade and lower field grade officers.

As Chief Judge Everett opined in *United States v. Means, supra,* the existence of special privileges creates special obligations. But more importantly, they create a very real incentive to demonstrate one's worthiness to have and to hold special privileges. Perhaps a reemphasis, or resurrection, of some of those small intangibles will reduce the number of officers who opt to "be one of the guys" rather than a leader.

MILLER, Judge (concurring in part and dissenting in part):

In so far as the majority recognizes that no "custom of the service" exists in the United States Air Force which criminalizes "fraternization" (social intercourse) between officers and enlisted personnel, I concur. See the evidence I presented for this position in *United States v. Rodriguez,* ACM 23545, 29 October 1982 (unpublished).

In so far, however, as the majority concludes that the absence of such a criminally enforceable "custom" precludes prosecution of those associations between officers and enlisted personnel which any reasonably prudent officer should immediately recognize are harmful to the maintenance of good order and discipline within the armed forces, I dissent. In my opinion, it is positively ludicrous to imply, as the majority has done in this case, that an officers corps can maintain the dignity and respect necessary to command the unquestioning obedience and trust of enlisted subordinates, if its members are permitted to randomly compete with one half of its subordinate population for the privilege of engaging

that subordinate population's other half in the intimacies of recreational fornication.

Accordingly, in addition to affirming the adultery specification, I would also affirm those specifications that allege conduct unbecoming an officer in that the accused's acts of fornication with enlisted personnel were, by their very nature, palpably and directly prejudicial to continued good order and discipline in the United States Air Force.

## A HISTORICAL ANALYSIS OF THE TERMS "CUSTOM OF THE SERVICE" AND "FRATERNIZATION"

Much has been written in recent case law and legal literature concerning a "long standing 'custom of the service'" that allegedly prohibits "fraternization" between military officers and enlisted personnel.[1] The general gist of these writings asserts that early in our nation's military history, any social intercourse whatever between officers and enlisted personnel, subjected both categories of offenders to immediate court-martial. It then implies that as our nation's concepts of democratic freedom of association expanded and permeated our military population, lines demarcating such unacceptable social intercourse between officers and enlisted personnel became hopelessly blurred (i.e., the line separating those associations which constituted the *per se* "custom of the service" offense of "fraternization" from those associations which were entirely acceptable, changed so rapidly and frequently that any semblance of the "common consent of the governed" necessary to successfully prosecute such "custom of the service" offenses was effectively obliterated).

See also, U.S. v. Rodriguez, supra; *United States v. Pitasi,* 20 U.S.C.M.A. 601, 44 C.M.R. 31 (1971); *United States v. Lovejoy,* 41 C.M.R. 777 (N.C.M.R.1968); *United States v. Free,* 14 C.M.R. 466 (N.B.R.1953); *United States v. Livingston,* 8 C.M.R. 206 (A.B.R.1952); *United States v. Rabb,* 81 B.R. 77 (1948); *United States v. Patterson,* 41 B.R. 365 (1944); *U.S. v. Jones,* 40 B.R. 149 (1944); and *U.S. v. Bunker,* 27 B.R. 385 (1943).

cers' and enlisted members' uniforms are only two examples.

1. See OPJAGAF 1971/69, 30 July 1971; Flatten, *Fraternization,* 10 Air Force Reporter 109 (Aug 1981). *See generally,* Nelson, *Conduct Expected of an Officer and a Gentleman: Ambiguity,* 12 JAG L.Rev. 124 (1970); Murphy, *The Soldier's Right to a Private Life,* 24 Mil.L. Rev. 97 (1964); J. Holm, *Women in the Military, An Unfinished Revolution* (1982); M.E. Treadwell, *The Women's Army Corps* (1954).

Specifically, these writings reasoned that because paragraph 213b, MCM (Rev.), 1969, states that a:

> [c]ustom arises out of long established practices which by common consent have attained the force of law in the military or other community affected by them,

then, "custom of the service" offenses, by definition, must cease their existence once the long established and accepted practices upon which they have purportedly been based, change.

Applying this logic to the instant case, the majority, first, correctly notes that it is no longer uncommon for Air Force officers and enlisted personnel to engage in activities that involve mutual social intercourse. Then, after pointing out that such activities violate those long established and accepted general practices upon which the Air Force's ban against "fraternization" is purportedly based, it concludes that the Air Force's "custom of the service" offense prohibiting "fraternization" is no longer viable. It continues that, since fornication is but a particularized type of "fraternization" (al-

beit, a uniquely intimate one), any prohibitions specifically precluding officers from engaging consenting enlisted personnel in this particular activity has also fallen. Accordingly, the majority concludes that, today, Air Force officers who fornicate with consenting enlisted personnel (or at least consenting enlisted persons who are not directly subordinate to them) do not commit an offense that is prosecutable under the U.C.M.J.

While I can well understand the initial attractiveness of this logic (I erroneously went down the same "rose colored path" in *Rodriguez, supra*), an in-depth historical analysis of its basic underlying assumptions shows that it is entirely spurious.

## CUSTOM OF THE SERVICE OFFENSES

Violations of a "custom of the service," *per se,* have never been prosecutable in the Army or the Air Force and they can no longer be prosecuted, as such, in any other branch of the armed forces of the United States.[2]

---

**2.** The term "custom of the service," as descriptive of a type of *per se* military offense, was used in none of the Articles of War or Army/Air Force Manuals for Court-Martial that pre-dated the U.C.M.J. and its implementing Manual for Courts-Martial. Neither was it ever used in such a sense by Colonel Winthrop in any of his sundry treatises interpreting the various versions of this nation's Articles of War. Nor was it ever used by any of those editors of Army Digest of Opinions who succeeded Winthrop. Rather, any use of the term "custom of the service" in all pre-U.C.M.J. military justice laws, manuals, and treatises, was always restricted to either matters of court-martial procedure (including commonly held military definitions of certain words descriptive of the legislatively pronounced elements of some offenses) or determinations of allowable punishments. *See, e.g., Winthrop,* Military Laws and Precedent, second edition (1920), at 41–42. Absent reduction of a custom or courtesy of the service to a law or regulation, or the independently prosecutable nature of a violator's conduct under the general articles of the Code, or its predecessing Articles of War, its violation was simply non-prosecutable at courts-martial. *See, e.g., Winthrop, supra,* at 617. Of over 284 opinions involving allegations of offenses involving untoward relationships between officers and enlisted personnel reported in the 81 volume JAGD Board of Review

Opinions, spanning 1929–1948, the 34 volume JAJD Board of Review Opinions (European Theater of Operations), spanning 1943–1946, and the 12 volume JAGD Board of Review and Judicial Council Opinions, spanning 1949–1951, only five of the least artful even referenced the term "custom of the service." In the only pre-Codal case that actually charged an accused with an Article of War 95/96 offense (prejudicial to discipline, conduct unbecoming) alleging that an accused's conduct was not in accordance with the "customs of the service," the charge was disapproved. *See United States v. Jones, supra.* In three of the others, each of which was upheld a lesser included Article of War 96 (currently, U.C.M.J., Art. 134) violation of an Article of War 95 (currently, U.C.M.J., Art. 133) conviction, the term was used only as a shorthand reference to the fact that the particular misconduct alleged had always been deemed prejudicial to good order and discipline in past Board of Review Opinions. *See United States v. Bunker, supra; United States v. Patterson, supra, United States v. Rabb, supra.* In the fifth case, the term was simply a part of the following catch-all sentence: "The acceptance by an officer of gratuities from enlisted personnel is subversive of good order and discipline, is contrary to the customs of the service, and to the spirit of . . . (a specific paragraph of an Army regulation)." *See United States v. Price,* 42 B.R. 243 (1944).

While the term "customs and courtesies of the service" has long been used by all United States military services to describe unwritten traditions of military service,[3]

When the U.C.M.J. (which, in 1950, for the first time, brought all members of United States military services under a single code of justice) was enacted, it continued the legislative tradition of the Articles of War by, again, refusing to recognize mere breaches of military custom or courtesy as a basis for trial by courts-martial. In an effort to placate Navy fears that the new U.C.M.J.'s Article 134 might not encompass all those "custom of the service offenses" that had previously been punishable by the Navy's Articles for the Government of the Navy (see Decker, History, Preparation and Processing, Manual for Courts-Martial, United States, 1951, at pp. 293–294 and footnote 5, herein, infra), the drafters of the 1951 Manual for Courts-Martial specifically mentioned that "a breach of a custom of the service may result in a violation of [the disorder and neglects to the prejudice of good order and discipline in the armed forces] clause of [U.C.M.J.] Article 134" (see M.C.M., paragraph 213b). But, both the language and placement of the quoted phrase, clearly belie any intention of to create a new category of per se offenses for simple breaches of military custom or courtesy; rather, the language simply acknowledges the obvious; to wit: that breaches of military custom and courtesy that also amount to conduct prejudicial to good order and discipline in the armed forces may be charged as conduct prejudicial to good order and discipline under U.C. M.J., Article 134. Of 34 opinions involving allegations of untoward relationships between officers and enlisted personnel reported in the 50 volume Court-Martial Reports and volumes 1–15 of the Military Justice Reporter, only four reference the term "custom of the service." In the first of these, the term's use is limited to a simple statement that long standing "customs of the service" prohibit officers from engaging in social intercourse with enlisted personnel to the extent that the familiarity induced by such social intercourse affects or prejudices good order or military discipline. See United States v. Livingston, supra. The second, after essentially repeating the language of the first, adds that the determination of which specific social intercourse between officers and enlisted personnel is prejudicial to good order or military discipline must be based upon the circumstances surrounding specific instances of such social intercourse. See United States v. Free, supra. The third, rejects an argument that offenses based upon alleged violations of "customs of the service" are inherently uncertain, indefinite, and unclear, noting that like any other Article 134 offense, the conduct violative of the alleged custom must be shown by its surrounding circumstances to be prejudicial to good order and discipline. See United States v. Lovejoy, supra. And the fourth, representing the Court of Military Appeals' only comment regarding the term, conforms the progressive logic of the first three to that Court's previous holdings regarding the continued validity of all Article 134 charges, extending the progressive logic of Livingston, Free, and Lovejoy so as to recognize that certain acts engaged in by an officer with an enlisted person, may "by their very nature, [be] palpably and directly prejudicial to the good order and discipline of the service," and thus violative of Article 134. See United States v. Pitasi, supra.

It is plainly evident, therefore, that the additional language of Paragraph 213b, M.C.M. (1951) which specifically noted that the Code's Article 134 prohibition includes any breaches of long standing "customs of the service" that coincidentally meet that Article's criteria, in no way changed the pre-Codal view of "customs of the service." Conduct breaching customs or courtesies of the service may still not be prosecuted in their own right. They continue to be prosecutable only if, coincidentally, the conduct they proscribe, also happens to constitute conduct which is prejudicial to good order and discipline in the armed forces or conduct unbecoming an officer, and, of course, then, they are prosecutable only because they independently violate either U.C.M.J. Article 134 or 133, not because they also happen to breach a "custom of the service."

3. Surveys of current "customs of the service," contained in recent issues of The Air Officer's Guide (an unofficial, but continually updated source book, that Air Force officers are often urged to obtain and read) identify numerous current "customs of the service." A brief sampling, reveals the following diversity: officers will not walk under umbrellas; an officer's word or statement will ordinarily be accepted without question; officers and airmen will not generally associate together in mutual social activities; when a junior walks with his senior he takes a position abreast and to the senior's left; the word "Sir" must be used when junior officers address senior ones, and by all airmen who address officers; officers should remain at a reception or social gathering until their commander has departed; when a child is born to an officer's family, the base commander is to send a personal letter of congratulations to the parents on behalf of his command; officers will support activities of their units, as well as, activities of the entire base; officers will periodically attend religious services at their base chapels; an officer's uniform and his official or social position must not be defamed; an officer never volunteers excuses; all official communications to superiors must be routed through command echelons; officers do not use vulgar or profane language; excessive indebtedness

only the now defunct Naval Courts and Boards, 1937, ever endeavored to make the simple violation of some of these customs, in and of themselves, triable by courts-martial.[4]

must be avoided; and airmen and officers stand erect unless seated, they must not lean.

While it is true that the origins of most of these customs are unknown, today, the prohibition against vulgar or profane language can be traced back as far as the Ordinance of Richard I, dated 1190 (*see Winthrop, supra,* at 903) and required attendance at religious services, mandatory use of command echelons in communications, and bans against close officer/soldier associations are traceable back through the Code of Articles of King Gustavus Adolphus of Sweden, dated 1621 (*see Winthrop, supra,* at 907–918). Indeed, James Thomas Flexner, in his definitive biography of George Washington, characterized the Continental forces' failure to observe the "custom of the service" prohibiting social familiarity between its officers and enlisted people as the greatest problem the general encountered when he assumed command of those forces.

4. Article 22, *Articles for the Government of the* Navy (1934 edition) provided:

(a) *Offenses not specified.*—All offenses committed by persons belonging to the Navy which are not specified in the foregoing articles shall be punished as a court martial may direct.

(b) *Fraudulent enlistment.*—Fraudulent enlistment, and the receipt of any pay or allowance thereunder, is hereby declared an offense against naval discipline and made punishable by general court martial, under this article.

In explaining the meaning of Article 22(a), Articles for the Government of the Navy (1934 edition), section 5 of *Naval Courts and Boards,* 1937 (the Navy's former court-martial manual), stated:

The sources of unwritten naval law are:
(a) Decisions of the courts.
    \*    \*    \*    \*    \*    \*
(b) Decisions of the President and the Secretary of the Navy and the opinions of the Attorney General and the Judge Advocate General of the Navy.
    \*    \*    \*    \*    \*    \*
(c) Court-martial orders.
    \*    \*    \*    \*    \*    \*
(d) Customs and usages of the service.
Circumstances from time to time arise for the government of which there are no written rules to be found. In such cases customs of the service govern. Customs of the service may be likened, in their origin and development, to the portions of the common law of England similarly established. But the custom is not to be confused with usage; the former has the force of law, the latter is

It is particularly ironic, therefore, that the three appellate cases most often quoted by writers, today, who argue that prosecutions for "fraternization" are based upon its status as a *per se* "custom of the service"

merely a fact. There may be usage without custom, but there can be no custom unless accompanied by usage. Usage consists merely of the repetition of acts, while custom is created out of their repetition.

*Custom.*—The following are the principal conditions to be fulfilled in order to constitute a valid custom:
(1) It must be long continued.
(2) It must be certain and uniform.
(3) It must be compulsory.
(4) It must be consistent.
(5) It must be general.
(6) It must be known.
(7) It must not be in opposition to the terms and provisions of a statute or lawful regulation or order.

As usage constantly observed for a long period results in the establishment of a custom, so long-continued nonusage will operate to destroy a particular custom, that is, to deprive it of its obligatory character.

The field of operation of the unwritten naval law is extensive. It is applied in defining certain offenses against naval law and in determining whether certain acts or omissions are punishable as such, as in cases coming under article 22 of the articles for the government of the Navy. At times, also, custom is appealed to as a rule of interpretation of terms technical to the naval service.

*Usage.*—Mere practices or usages of service, although long-continued, are not customs and have none of the obligatory force which attaches to customary law. The fact that such usages exist, therefore, can never be pleaded in justification of conduct otherwise criminal or reprehensible, nor be relied upon as a complete defense in a trial by court-martial. With the permission of the court, however, they may be introduced in evidence, with a view to diminishing to some extent the degree of criminality involved in the offense charged.

While sections 98 and 99 of Naval Courts and Boards (1937) incorporated the current U.C.M.J.'s general articles pertaining to conduct prejudicial to good order and discipline and conduct unbecoming an officer into Article 22 of the Articles for the Government of the Navy, it also incorporated: (1) a number of offenses not elsewhere prohibited by the Articles for the Government of the Navy which are currently prohibited by specific Articles of the U.C.M.J. (and which, prior to the U.C.M.J., were prohibited in the Army and Air Force by specific Articles of the Articles of War) and (2) a number of, apparently, *per se* custom of the service offenses which, although very similar to in-

stances of misconduct currently proscribed by U.C.M.J., Articles 133 and 134, required absolutely no proof that the conduct was either prejudicial to good order and discipline or that it constituted behavior unbecoming an °officer and a gentlemen.

In the former category were: (1) affray or disorder, riot, and unlawful assembly, see Navy Courts and Boards, section 92, and U.C.M.J., Article 116, 10 U.S.C. § 916; (2) blackmail and extortion, see Navy Courts and Boards, section 93, and U.C.M.J., Article 127, 10 U.S.C. § 927; (3) breaking arrest, see Navy Courts and Boards, section 94, and U.C.M.J. Article 95, 10 U.S.C. § 895; (4) burglary or housebreaking, see Navy Courts and Boards, section 96, and U.C.M.J. Articles 129 and 130, 10 U.S.C. §§ 929, 930; (5) embezzlement of money or property not intended for military service, see Navy Courts and Boards, section 100, and U.C.M.J., Article 121, 10 U.S.C. § 92; (6) false imprisonment, see Navy Courts and Boards, section 101, and U.C.M.J., Article 97, 10 U.S.C. § 897; (7) forgery other than for the purpose of obtaining payment of a claim against the United States, see Navy Courts and Boards, section 102, and U.C.M.J., Article 123, 10 U.S.C. § 923; (8) fraudulent enlistment, see Navy Courts and Boards, section 103, and U.C.M.J., Article 83, 10 U.S.C. § 883; (9) malingering, see Navy Courts and Boards, section 104, and U.C.M.J., Article 115, 10 U.S.C. § 915; (10) neglect of duty, see Navy Courts and Boards, section 105, and U.C.M.J., Article 92(3), 10 U.S.C. § 892(3); (11) resisting arrest, see Navy Courts and Boards, section 106, and U.C.M.J., Article 95; (12) sodomy, see Navy Courts and Boards, section 108, and U.C.M.J., Article 125, 10 U.S.C. § 925; (13) uttering forged or counterfeit document other than for the purpose of obtaining payment of a claim against the United States, see Naval Courts and Boards, section 110, and U.C.M.J., Article 123; (14) willful destruction of non-public property, see Naval Courts and Boards, section 111, and U.C.M.J., Article 109, 10 U.S.C. § 909; (15) conspiracy other than to defraud the United States by means of a false claim, see Naval Courts and Boards, section 112, and U.C.M.J., Article 81, 10 U.S.C. § 881; (16) perjury and subornation thereof before a judicial proceeding or in a course of justice, see Naval Courts and Boards, section 115, and U.C.M.J., Article 131, 10 U.S.C. § 931; (17) aiding escape of person under arrest, see Naval Courts and Boards, section 116, and U.C.M.J., Articles 77, 78, and 96, 10 U.S.C. §§ 877, 878, 896; (18) manslaughter, see Naval Courts and Boards, section 119, and U.C.M.J., Article 119, 10 U.S.C. § 919; (19) assaulting or striking a person not in the navy, see Naval Courts and Boards, section 120, and U.C.M.J., Article 128, 10 U.S.C. § 928; (20) rape and carnal knowledge, see Naval Courts and Boards, section 121, and U.C.M.J., Article 120, 10 U.S.C. § 920; (21) maiming, see Naval Courts and Boards, section 122, and U.C.M.J., Article 124, 10 U.S.C. § 924; (22) robbery, see Naval Courts and Boards, section 123, and U.C.M.J., Article 122, 10 U.S.C. § 922; and, (23) arson, see Naval Courts and Boards, section 124, and U.C.M.J., Article 126, 10 U.S.C. § 926.

In the latter category were the Navy's per se custom of the service offenses of: (1) scandalous conduct, see Naval Courts and Boards, section 59 (although no specific model specification in the M.C.M. covers such misconduct, see generally the elements of U.C.M.J., Article 133 and the discrediting provision of U.C.M.J., Article 134); (2) breaking quarantine, see Naval Courts and Boards, section 95, and see M.C.M., specification form 173, at A6–25; (3) carelessly or negligently endangering lives of others, see Naval Courts and Boards, section 97 (although no model specification in the M.C.M. specifically covers such misconduct, see generally, M.C.M., specification forms 150 and 151, at A6–22); (4) seduction, see Naval Courts and Boards, section 107 (although no model specification in the M.C.M. specifically covers such misconduct, see generally, the elements of U.C.M.J., Article 133 and the discrediting provision of U.C.M.J., Article 134); (5) unauthorized use of vehicles, see Naval Courts and Boards, section 109 (although no model specification in the M.C.M. specifically covers such misconduct, see generally, U.C.M.J., Article 121(a)(2), M.C.M., specification form 148, at A6–22, and the prejudice to good order and discipline provision of U.C.M.J., Article 134); (6) forging military or naval certificate of discharge or pass, see Naval Courts and Boards, section 113, and see M.C.M., specification form 147, at A6–22; (7) bribery, see Naval Courts and Boards, section 114, and see M.C.M., specification forms 131 and 132, at A6–20 and A6–21; (8) perjury and subornation thereof other than before a judicial proceeding or in a course of justice, see Naval Courts and Boards, section 115, and see M.C.M., specification forms 169 and 170, at A6–25; (9) offenses against the postal service, see Naval Courts and Boards, section 117, and see M.C.M., specification forms 160, 161, and 162, at A6–23 and A6–24; (10) offenses against foreign and interstate commerce, see Naval Courts and Boards, section 118, and see M.C.M., specification form 182, at A6–26; (11) receiving stolen goods, see Naval Courts and Boards, section 125, and see M.C.M., specification form 179, at A6–26; (12) circulating obscene literature, see Naval Courts and Boards, section 126 (no similar provision is mentioned in either the U.C.M.J. or M.C.M.); (13) polygamy, unlawful cohabitation, adultery and fornication, see Naval Courts and Boards, section 127, and see M.C.M., specification forms 130, 188, 127, and 159, at A6–20, A6–23, and A6–26; (14) narcotics offenses, see Naval Courts and Boards, section 128, and see M.C.M., specification forms 144, 145, and 146, at A6–22; and, (15) wrongful movement of liquor, see Naval Courts and Boards, sec 129 (not specifically addressed by an M.C.M. specification form).

offense (to wit: *United States v. Free,* 14 C.M.R. 466 (N.B.R.1953), *United States v. Lovejoy,* 41 C.M.R. 777 (N.B.R.1953), and *United States v. Pitasi,* 20 U.S.C.M.A. 601, 44 C.M.R. 31 (1971)), are, in fact, the very ones which sounded the judicial death knell for the only *per se* "custom of the service" offense practice ever recognized in the armed forces, that of the Navy prior to the U.C.M.J.'s enactment.[5]

5. In 1944, the Judge Advocate General of the Navy, interpreting the limitations imposed upon Articles for the Government of the Navy, Article 22, by Naval Courts and Boards (1937), section 5, set aside an Article 22 charge and specification that alleged a naval officer had fraternized with an enlisted man by taking him to dinner, to the theater, and to his hotel room, where he had spent the night with the enlisted man while occupying the same bed. This action was taken because none of the specific facts pleaded in the charge and its specification were sufficient, in and of themselves, to allege any violation of either written law, as identified by Naval Courts and Boards (1937), section 3, or those unwritten naval laws that could properly be identified by reference to Naval Courts and Boards (1937), Section 5. *See United States v. Yocum,* CMO 3, 1944, at 412. Since he had earlier recognized that the Navy's long recognized "custom of the service" banning fraternization (any social intercourse between its officers and enlisted personnel) was far too general to be enforceable as an Article 22 violation, *see* CMO 2, 1941, at 271, and because no more specific prohibitions against certain types of fraternization had either been authorized by Navy decisions and opinions or were readily discernible as independent "customs of the service," the Navy Judge Advocate General could, in 1944, have rendered no other decision consistent with his then existing legislative and administrative mandates.

Following enactment of the Code, however, a specification alleging similar conduct by another naval officer arrived in the Navy Judge Advocate General's office. Unlike the former specification, however, this one, having been charged under U.C.M.J., Article 134, carried with it the additional factual allegation that the other facts stated therein were "all to the prejudice of good order and discipline in the armed forces of the United States." Since, U.C.M.J., Article 134, itself, purported to subject to court-martial "all disorders and neglects to the prejudice of good order and discipline in the armed forces" committed by persons subject to the Code, the Judge Advocate General decided to refer it to his newly formed Navy Board of Review for resolution.

The Navy Board, considering the matter in *United States v. Free, supra,* identified the problem before them as being one of drawing "a line as to where acts of fraternization or association with enlisted men by officers cease to be innocent acts of comradeship and normal social intercourse between members of a democratic military force and become a violation of Article 134 of the Code, prejudicial to good order and discipline in the armed forces of the United States." After noting that efforts "to lay down a measuring rod of particularities to determine in advance what acts are prejudicial to good order and discipline and what are not," it concluded:

that each case must be determined on its own merits. Where it is shown that the acts and circumstances are such as to lead a reasonably prudent person, experienced in the problems of military leadership, to conclude that the good order and discipline of the armed forces has been prejudiced by the compromising of an enlisted person's respect for the integrity and gentlemanly obligations of an officer, there has been an offense under Article 134.

*United States v. Free, supra,* at 470.

Of additional interest, is the fact that the specification in *Free* included a "throwback" factual allegation conforming the specification to the outmoded requirements of Naval Courts and Boards (1937), section 5, standards for unwritten naval law (to wit: that the accused's conduct was "in violation of the custom of the Naval service of the United States that officers shall not fraternize or associate with enlisted men on terms of military equality"). After noting that its Judge Advocate General had earlier determined no "custom of the service" exists in the Navy that, *per se,* precludes the specific types of conduct alleged by the specification, the Navy Court merely noted that "[t]he rule under the U.C.M.J. governing the adequacy of the pleading is that a pleading is sufficient if it informs the accused of what he must be prepared to meet and it, as supplemented by the evidence, is sufficiently definite to eliminate the danger of again being placed in jeopardy for the same offense." Its superfluous inclusion in the specification obviously had no bearing upon the decision rendered in the case.

Seventeen years later, in the first of two specifications that included the term "fraternize" which the United States Court of Military Appeals has considered in its 33 year history, (the navy specification alleging only that the accused naval officer "Willfully and knowingly fraterniz[ed] with one Seaman [N] on terms of military equality to the prejudice of good order and discipline") the Court in *United States v. Lovejoy,* 20 U.S.C.M.A. 18, 42 C.M.R. 210 (1970) avoided addressing a "vagueness" chal-

Regardless, then, of how often, and by whom, it has been implied that prosecutions for "fraternization" offenses are dependent upon the continued existence of "long standing customs of the service" (or, more specifically, the common recognition of the current vitality of such customs by a vast majority of service personnel), this simply is not the case. Today, unless specific conduct (or a specific type of conduct) (1) violates one of the U.C.M.J.'s specific Articles or (2) it either is palpably and directly "prejudi- cial to good order and discipline," "service discrediting," or a "crime or offense not capital" under Article 134 or amounts to "conduct unbecoming an officer" under Ar- ticle 133, it may not be prosecuted at courts-martial.

When determining whether a custom of the service breach may be prosecuted under the U.C.M.J., the only relevant question to be asked is the one which is entirely disposi- tive; to wit: Whether the specific or gener- al type of conduct alleged violates any puni-

---

lenge by finding that the accused's Article 134 "fraternization" conviction had merged with a simultaneous sodomy conviction.

Then, in 1971, the Court of Military Appeals, in *United States v. Pitasi,* 20 U.S.C.M.A. 601, 44 C.M.R. 31 (1971), squarely addressed the suffi- ciency of a navy specification alleging that a naval officer had "fraternized" and "associat- ed" with an enlisted person:

> ... in violation of the custom of the Naval Service of the United States that officers shall not fraternize and associate with enlist- ed men on terms of military equality.

Confronted by a defense contention that "fra- ternization" is not a cognizable court-martial offense, the Navy rebutted by arguing that " 'fraternization' by an officer with an enlisted man has, 'by custom,' always been held to be prejudicial to good order and discipline in the armed forces." (In view of the Navy's earlier decision in *United States v. Yocum, supra,* that acts of fraternization or association by Naval officers with enlisted personnel, in and of them- selves, do not violate Naval custom, and its later holding in *United States v. Free, supra,* that when such acts of fraternization or associ- ation prejudice good order or discipline they are cognizable by court-martial as a violation of U.C.M.J., Article 134, this rebuttal argument was presumably meant to emphasize the phrase "prejudicial to good order and disci- pline," and to imply that had the fraternization in *Yocum,* been alleged as "prejudicial to good order and discipline," as it was in *Free,* a simi- lar decision would have been reached.)

After briefly consulting *Winthrop, supra,* and referencing paragraph 213*b* of the M.C.M., the Court of Military Appeals approvingly quoted those portions of *United States v. Free* in which the Navy court had discussed the prejudicial effect of intimate types of personal relation- ships between officers and enlisted personnel on military discipline. Included in these quotes was the standard suggested by the Navy court for determining what acts of fraternization are, and what acts of fraternization are not, prejudi- cial to good order and military discipline within the meaning of U.C.M.J., Article 134. (For the text of this quotation, see my discussion of *Free* within this footnote, *supra.*)

Having completed its cursory review of the law in the area, the Court of Military Appeals, first, cautioned services against attempting to prosecute any custom, not palpably and direct- ly prejudicial to good order and military disci- pline, under U.C.M.J., Article 134, by stating:

> These factors, however, do not, in our opin- ion, relieve military authorities from the obli- gation of providing *some guidelines* by which an officer, or those who are called upon to sit in judgment as members of a court-martial, may test what conduct is or is not violative of the "custom," in light of the fact that our armed forces are currently constituted of a large number of citizen soldiers.

And, second, it recommended that, since regu- latory proscription of conduct prohibited by a "custom of the service" (even though it be prejudicial to good order and military disci- pline, and, accordingly, otherwise prosecutable under U.C.M.J., Article 134), has the advantage over Article 134, of precise definition, publica- tion, and definite punishment parameters, res- ponsible military authorities should consider reducing all of their existing "custom of the service" prohibitions into regulatory form.

Having stated these two ancillary proposi- tions, however, the Court's response to the defense's contention that allegations of frater- nization are so vague as not to be cognizable by court-martial, was exceptionally acerbic:

> We in no way intend to depart from our holding in *United States v. Sadinsky,* wherein we reiterated our prior decision that Article 134 is not void for vagueness, that some acts are by their very nature palpably and directly prejudicial to the good order and discipline of the service. [Citations omitted.]

Unless it is specifically proscribed by another article of the Code, conduct alleged in an Arti- cle 134 specification which, by its very nature directly is palpably and directly prejudicial to the good order and discipline of the service, constitutes a violation of Article 134, which is cognizable by court-martial. Whether or not this same conduct, also, happens to violate a "custom of the service," be it a prohibition against "fraternization" or any other activity, is completely irrelevant.

tive article of the U.C.M.J., including either of its two general articles. Whether the custom of the service allegedly breached is, or remains, viable, is totally irrelevant.

While cynics may argue that the question of exactly what conduct constitutes an offense under either of these two general articles is based to some extent on "customs of the service," I would counter that a critical examination of post-Codal case law reveals, instead, that this precise question has always been uniformly decided either by a disciplined analysis of whether, in fact, one of the specific "general elements"[6] of the particular general article is or is not satisfied, or by citations to past cases[7] in which a particular offense's existence has already established by such an analysis.

## FRATERNIZATION

Before discussing whether the conduct alleged in this case meets one or more of the "general elements" of either of the U.C.M.J.'s general articles, however, it is necessary, first, to comment upon the very generalized approach that all of my fellow judges have used in their discussions of the specific conduct alleged by the instant specifications. Rather than addressing the specific conduct which the specifications alleged (an officer's indiscriminate "recreational" fornication with enlisted personnel in violation of Article 133 of the U.C.M.J.), they have, instead, chosen to address the question of whether or not a charge of "fraternization" can properly be affirmed as a violation of this Article. In my opinion, it is this patently incorrect statement of the question before them, more than any other single factor, that resulted in their fuzzy and occasionally incorrect handling of those principles necessary to a clear and proper resolution of this case.

An in-depth historical analysis of the most recent 238 military appellate case decisions dealing with allegations generically capable of categorization as "fraternization type offenses" (or untoward officer/enlisted conduct) irrefutably demonstrates my point.

The first recorded use of the term "fraternization" occurred in *United States v. Bunker,* 27 B.R. 385 (1943). There, an Army Board of Review, apparently confronting contentions that an allegation of conduct which violated the, then recognized, Army "custom of the service" that prohibited any "fraternization" between officers and enlisted personnel could be prosecuted solely on the basis that the alleged conduct violated a "custom of the service," cleverly modified the traditional statement of that customary ban against fraternization by stating:

> [I]t has long been recognized as a custom of the service that an officer should not fraternize with enlisted men *to the extent that it will affect or prejudice good order and discipline.* [Emphasis on modifying language provided.]

*United States v. Bunker, supra,* at 389.

This modifying language was, of course, exceptionally significant. It limited prosecutions for breaches of this particular custom of the service to those few breaches in which the breaching conduct, itself, independently, satisfied the separate criteria for prosecution required by U.C.M.J., Article 134. (Compare the effect of the mollifying language of M.C.M., paragraph 213b, some eight years later. *See* note 2, herein, *supra.*)

Other usage of the term "fraternize" or "fraternization" has occurred in only ten of the remaining 237 case decisions that have dealt with "fraternization type offenses."[8] In five of these, the term was used to

---

6. For an excellent example of such a disciplined analysis, establishing that a specific example of "fraternization" type conduct, in fact, satisfies the "prejudicial to good order and discipline" general element of Article of War 96 (now, U.C.M.J., Article 134), *see United States v. Lillis,* 39 B.R. 395 (1944).

7. For excellent examples of such a confirmation of the existence of a general article's offense, despite passing references to "customs of the service," *see United States v. Bunker* and *United States v. Livingston,* both *supra.*

8. I do not here consider eight cases that used these terms only in reference to regulatory prohibitions against social intercourse between

describe several instances of varied officer/enlisted misconduct alleged separately or in combination with one another in one or more specifications.[9] In two of them, it was used solely to describe allegations that an officer had made male/female sexual overtures to an enlisted person.[10] And, in the final three, it was used, once each, in reference to an officer/enlisted homosexual liaison,[11] an officer's behavior in the presence of enlisted men amounting to drunk and disorderly conduct;[12] and, a bare, unsupported, allegation that an officer "wrongfully fraternize[d] with enlisted men (the board dismissed this allegation based upon lack of evidence)."[13]

Of the entire 238 recorded cases, only five referenced any specifications that included the term "fraternization," and only two of these (one of which, also, included factual allegations as to the manner in which the alleged "fraternization" had occurred) were ultimately affirmed.[14]

What is *most* significant about these 238 cases is the fact that, in 227 of them, neither the generic term "fraternization" nor any of its derivatives was even mentioned! Rather, in these cases, the courts and boards recognized that questions pertaining to whether alleged officer/enlisted misconduct does, or does not, breach a

soldiers and foreign nationals in the European Theater, rather than in reference to any proscription against similar relationships between officers and enlisted persons serving together in our Armed Forces. *See United States v. Mistretta,* 16 B.R. (ETO) 191 (1945); *United States v. Van Houten,* 18 B.R. (ETO) 65 (1945); *United States v. Blankenship,* 22 B.R. (ETO) 279 (1945); *United States v. Wofford,* 24 B.R. (ETO) 346 (1945); *United States v. Malott,* 27 B.R. (ETO) 259 (1945); *United States v. Wilson,* 30 B.R. (ETO) 75 (1945); *United States v. Newman,* 32 B.R. (ETO) 57 (1945); and *United States v. Wallace,* 34 B.R. (ETO) 131 (1946).

9. *See United States v. Patterson,* 41 B.R. 365 (1944); *United States v. Leonard* 16 B.R. (ETO) 279 (1945); *United States v. Penick,* 19 B.R. (ETO) 257 (1945); *United States v. Livingston,* 8 C.M.R. 206 (A.B.R.1952); and *United States v. Free,* 14 C.M.R. 466 (N.B.M.R.1953).

10. *See United States v. Morgan,* 41 B.R. 73 (1944) and *United States v. Brauchler,* 15 M.J. 755 (A.F.C.M.R.1983).

11. *See United States v. Lovejoy,* 41 C.M.R. 777 (N.C.M.R.1968).

12. *See United States v. Fiedler,* 33 B.R. 189 (1944).

13. *See United States v. Jones,* 40 B.R. 149 (1944).

14. In the sole pre-Codal citation of a specification incorporating a usage of the term "fraternization," an Army board of review in *United States v. Jones,* supra, dismissed an Articles of War, Article 96, specification alleging simply that the accused "did . . . wrongfully fraternize with enlisted men, thereby seriously compromising his position as an officer" because "no substantial evidence whatsoever of [the accused officer's] wrongful fraternization with enlisted men" was presented at trial.

In *United States v. Free,* 14 C.M.R. 466 (N.B. R.1953), a Navy board of review, affirmed a conviction pursuant to a U.C.M.J., Article 134, specification, which alleged that the accused "did . . . willfully and knowingly, in the room assigned to [him], . . . fraternize and associate with [a private first class] . . . on terms of military equality by having said [private first class] in said room as his . . . guest and offering said [private first class] . . . alcoholic beverages to drink while his guest in said room and by inviting said [private first class] . . . to sleep in said room as his guest, . . . all to the prejudice of good order and discipline in the armed forces of the United States."
In doing so, the board specifically found, both, that the accused officer had been "fairly apprised" of the offenses to which the specification pertained and that the officer's behavior had, in fact, prejudiced good order and military discipline in the naval service.
In the third of these five cases, an Article 134 specification alleging that an accused "did . . . willfully and knowingly fraternize and associate with [a seaman] . . . on terms of military equality" by having the seaman as his "guest" in his apartment and sharing with him the cost of food "to the prejudice of good order and discipline" was considered first by the navy court of military review in *United States v. Lovejoy,* 41 C.M.R. 777 (N.C.M.R.1969), and then by the Court of Military Appeals in *United States v. Lovejoy,* 20 U.S.C.M.A. 18, 42 C.M.R. 210 (1970). The Navy Court, below, affirmed the specification, dismissing a constitutional "vagueness and indefinite" argument as to the specification's sufficiency, by simply stating, without citations, that "After a careful analysis and review of all the circumstances of this case, we arrive at [an] opposite conclusion." The Court of Military Appeals, when faced with an identical argument, above, refused to address the question it presented, opting, instead, to dismiss the specification on other grounds.

"custom of the service" prohibiting "fraternization" are irrelevant to the legal sufficiency of Article 133 or 134 specifications that allege such misconduct. Accordingly, they limited their consideration of that issue to those few questions that are relevant to wit: whether the misconduct alleged within the particular Article 133 or 134 specification confronting them, was, or was not, of a nature to "prejudice good order and military discipline," "discredit the military service," or amount to "conduct unbecoming an officer and a gentleman."

And, turning from court, to code or manual usage of the term, we find that, unlike the phrase "custom of the service," the term "fraternize" or "fraternization" has never been used in any United States military law or manual for courts-martial.

My fellow judges, then, erred when they chose to define the issue before this Court in terms of a generalized generic notion of fraternization rather than in terms of that factually detailed misconduct which is alleged within the instant U.C.M.J., Article 133 specifications. While those portions of their opinions that relate to the demise of the Air Force's now defunct "custom of the service" banning "fraternization" and the question of whether violations of such a defunct custom may nevertheless still be

prosecuted as Article 133 "customs of the service" violations are interesting, they are totally irrelevant to the issue presented by this case. The sole question before us for decision is whether the factually detailed misconduct alleged within the instant Article 133 specifications, under the circumstances of this case, is immediately recognizable by a reasonably prudent officer as an example of conduct that would subject him to potential prosecution for conduct unbecoming an officer and a gentleman.

Unfortunately, by limiting their discussions of the history of "fraternization type cases" to those few cases which actually contained the term "fraternize" or "fraternization," my fellow judges also overlooked some exceptionally useful and exceptionally relevant generalizations pertinent to the resolution of this quintessential question. Had they expanded their research so as to encompass those cases which, although not mentioning the term "fraternization," nevertheless, dealt with specific allegation of officer/enlisted misconduct alleged to have violated one of the general articles, they would have been able to glean four distinct categories of officer/enlisted behavior recognized time and again by our appellate courts as violating the proper criteria of Article 133 and 134 offenses.[15] Even more

---

**15.** My personal review of 237 military appellate decisions that have dealt with Article 133 and 134 allegations of officer misconduct in relation to enlisted personnel reveals, without exception, that all such allegations fit neatly into conduct described by one of four sub-headings.

The first of these may be categorized as alcohol related offenses. They include those allegations of conduct in which the courts, under the particular circumstances of the case, have concluded that, whether by virtue of simple or excessive personal use, or simple provision of the substance to enlisted persons, an officer has demeaned the position of "a commissioned officer" within the eyes of enlisted ranks. *See United States v. Hammond,* 1 B.R. 83 (1929); *United States v. MacIver,* 2 B.R. 321 (1931); *United States v. Fleming,* 2 B.R. 359 (1931); *United States v. Lowry,* 6 B.R. 67 (1934); *United States v. Shirley,* 6 B.R. 337 (1935); *United States v. Gould,* 7 B.R. 49 (1935); *United States v. Lowry,* 8 B.R. 377 (1937); *United States v. Raymond,* 10 B.R. 169 (1939); *United States v. Hester,* 11 B.R. 145 (1941); *United States v. Harris,* 11 B.R. 171 (1941); *United States v.*

*Callan,* 12 B.R. 49 (1941); *United States v. Bethard,* 12 B.R. 67 (1941); *United States v. Knight,* 13 B.R. 27 (1942); *United States v. Brown,* 13 B.R. 183 (1942); *United States v. Jones,* 13 B.R. 231 (1942); *United States v. Smith,* 14 B.R. 371 (1942); *United States v. Saul,* 15 B.R. 197 (1942); *United States v. Taliaferro,* 16 B.R. 187 (1942); *United States v. Hess,* 49 B.R. 231 (1942); *United States v. Wall* 16 B.R. 233 (1943); *United States v. O'Maley,* 16 B.R. 285 (1943); *United States v. Griffin,* 17 B.R. 85 (1943); *United States v. Granosk,* 17 B.R. 193 (1943); *United States v. Daly,* 17 B.R. 333 (1943); *United States v. Minnis,* 18 B.R. 101 (1943); *United States v. Parks,* 19 B.R. 23 (1943); *United States v. Paradise,* 19 B.R. 43 (1943); *United States v. Brennan,* 19 B.R. 139 (1943); *United States v. Slaughter,* 20 B.R. 9 (1943); *United States v. Lyday,* 20 B.R. 37 (1943); *United States v. Murphy,* 21 B.R. 13 (1943); *United States v. Westcott,* 21 B.R. 41 (1943); *United States v. Nelson,* 21 B.R. 55 (1943); *United States v. Singletary,* 21 B.R. 399 (1943); *United States v. Baker,* 22 B.R. 131 (1943); *United States v. Cannon,* 22 B.R. 237

importantly, they might have recognized that the behavior alleged, here, falls distinctly within the fourth of these actionable categories, demeaning sexual behavior.

(1943); *United States v. Johnston*, 23 B.R. 57 (1943); *United States v. Hyre*, 23 B.R. 115 (1943); *United States v. Minton*, 23 B.R. 159 (1943); *United States v. Biggs*, 25 B.R. 385 (1943); *United States v. Ferguson*, 26 B.R. 43 (1943); *United States v. Shapiro*, 26 B.R. 43 (1943); *United States v. Bunker, supra; United States v. Thorn*, 29 B.R. 237 (1943); *United States v. Gage*, 1 B.R. (ETO) 299 (1943); *United States v. Nicholson*, 1 B.R. (ETO) 397 (1943); *United States v. Booker*, 2 B.R. (ETO) 325 (1943); *United States v. Bradford*, 30 B.R. 279 (1944); *United States v. Green*, 31 B.R. 51 (1944); *United States v. Norren*, 32 B.R. 95 (1944); *United States v. Fiedler, supra; United States v. Watts*, 33 B.R. 195 (1944); *United States v. Blanton*, 33 B.R. 221 (1944); *United States v. McPheron*, 33 B.R. 325 (1944); *United States v. Bates*, 34 B.R. 147 (1944); *United States v. Martin*, 34 B.R. 223 (1944); *United States v. Goggin*, 34 B.R. 399 (1944); *United States v. Roundtree*, 36 B.R. 283 (1944); *United States v. MacFarlane*, 38 B.R. 338 (1944); *United States v. Lillis*, 39 B.R. 395 (1944); *United States v. Jones, supra; United States v. Nettles*, 40 B.R. 385 (1944); *United States v. Myers*, 41 B.R. 83 (1944); *United States v. Patterson, supra; United States v. Rooney*, 42 B.R. 119 (1944); *United States v. Evans*, 42 B.R. 187 (1944); *United States v. Price, supra; United States v. Carey*, 43 B.R. 261 (1944); *United States v. McCoy*, 44 B.R. 81 (1944); *United States v. Madden*, 4 B.R. (ETO) 253 (1944); *United States v. Moffit*, 7 B.R. (ETO) 113 (1944); *United States v. Whalen*, 10 B.R. (ETO) 201 (1944); *United States v. Buck*, 11 B.R. (ETO) 187 (1944); *United States v. Gardner*, 13 B.R. (ETO) 127 (1944); *United States v. Long*, 13 B.R. (ETO) 291 (1944); *United States v. Glover*, 14 B.R. (ETO) 67 (1944); *United States v. Newcombe*, 14 B.R. (ETO) 93 (1944); *United States v. Campbell*, 14 B.R. (ETO) 127 (1944); *United States v. Wright*, 44 B.R. 183 (1945); *United States v. Kelley*, 46 B.R. 89 (1945); *United States v. Foster*, 46 B.R. 295 (1945); *United States v. Futrell*, 47 B.R. 339 (1945); *United States v. Ponsler*, 51 B.R. 47 (1945); *United States v. Packard*, 52 B.R. 125 (1945); *United States v. Buckner*, 53 B.R. 197 (1945); *United States v. Mann*, 55 B.R. 381 (1945); *United States v. Skinner*, 17 B.R. (ETO) 317 (1945); *United States v. Walker*, 18 B.R. (ETO) 33 (1945); *United States v. Manning*, 18 B.R. (ETO) 201 (1945); *United States v. Taylor*, 18 B.R. (ETO) 319 (1945); *United States v. McBride*, 15 B.R. (ETO) 91 (1945); *United States v. Leonard, supra; United States v. Thorpe*, 19 B.R. (ETO) 245 (1945); *United States v. Penick, supra; United States v. Sirois*, 20 B.R. (ETO) 21 (1945); *United States v. Suitt*, 20 B.R. (ETO) 265 (1945); *United States v. Dawson*, 21 B.R. (ETO) 95 (1945); *United States v. Wetherford*, 22 B.R. (ETO) 147 (1945); *United States v. Hindmarch*, 22 B.R. (ETO) 223 (1945); *United States v. Shipley*, 22 B.R. (ETO) 257 (1945); *United States v. Patton*, 23 B.R. (ETO) 75 (1945); *United States v. Petroski*, 23 B.R. (ETO) 81 (1945); *United States v. Roberson*, 23 B.R. (ETO) 149 (1945); *United States v. Tucker*, 23 B.R. (ETO) 319 (1945); *United States v. O'Hara*, 24 B.R. (ETO) 93 (1945); *United States v. Vollmer*, 24 B.R. (ETO) 281 (1945); *United States v. Stark*, 24 B.R. (ETO) 332 (1945); *United States v. Buck*, 25 B.R. (ETO) 213 (1945); *United States v. St. George*, 25 B.R. (ETO) 367 (1945); *United States v. Traynor*, 25 B.R. (ETO) 377 (1945); *United States v. Bradford*, 28 B.R. (ETO) 91 (1945); *United States v. Ingham*, 30 B.R. (ETO) 83 (1945); *United States v. Bryant*, 30 B.R. (ETO) 291 (1945); *United States v. Snyder*, 31 B.R. (ETO) 181 (1945); *United States v. Marrs*, 31 B.R. (ETO) 243 (1945); *United States v. Gunning*, 32 B.R. (ETO) 85 (1945); *United States v. Powell*, 33 B.R. (ETO) 221 (1945); *United States v. Griffith*, 33 B.R. (ETO) 239 (1945); *United States v. Parkinson*, 34 B.R. (ETO) 11 (1945); *United States v. Epperson*, 58 B.R. 323 (1946); *United States v. Pasquariello*, 60 B.R. 179 (1946); *United States v. Glass*, 60 B.R. 185 (1946); *United States v. Hart*, 60 B.R. 247 (1946); *United States v. Clovatre*, 60 B.R. 381 (1946); *United States v. Shirley*, 63 B.R. 65 (1946); *United States v. Heaton*, 64 B.R. 3 (1946); *United States v. McMaster*, 64 B.R. 171 (1946); *United States v. Creighton*, 70 B.R. 355 (1947); *United States v. Ward*, 72 B.R. 301 (1947); *United States v. Dows*, 73 B.R. 275 (1947); *United States v. Becker*, 78 B.R. 329 (1948); *United States v. Kearbey*, 2 B.R.J.C. 281 (1949); *United States v. Boraczek*, 4 B.R.J.C. 283 (1949); *United States v. Powers*, 8 B.R.J.C. 111 (1950); *United States v. Hansen*, 10 B.R.J.C. 165 (1951); *United States v. Clarke*, 3 C.M.R. 227 (A.B.R.1951); *United States v. Akins*, 4 C.M.R. 364 (A.B.R.1951); *United States v. Powers*, 5 C.M.R. 206 (A.B.R.1951); *United States v. Livingston, supra; United States v. Jackson*, 8 C.M.R. 215 (A.B.R.1952); *United States v. Loney*, 8 C.M.R. 533 (A.B.R.1952); *United States v. Johnson*, 10 C.M.R. 513 (A.B.R.1953); *United States v. Sloan*, 14 C.M.R. 375 (A.B.R.1953); *United States v. Free, supra; United States v. Long*, 7 U.S.C.M.A. 265, 22 C.M.R. 55 (1956); *United States v. McCardle*, 27 C.M.R. 1006 (A.B.R.1958); *United States v. Lovejoy, supra*; and *United States v. Pitasi, supra*. For cases prior to 1920, *see Winthrop, supra*, at 716–717, notes 44 and 47, and at 728, note 26.

The second such subheading includes those charges which allege that, under the circumstances alluded to in the cases, an officer somehow either demeaned the respect due to commissioned officers and/or subjected his person-

al impartiality to criticism by "gambling" for money with enlisted personnel. Included among these cases, see *United States v. Van Hess,* 14 B.R. 271 (1942); *United States v. Thompson,* 14 B.R. 133 (1942); *United States v. Cromer,* 15 B.R. 17 (1942); *United States v. Marinelli,* 18 B.R. 377 (1943); *United States v. Black,* 20 B.R. 345 (1943); *United States v. Johnston, supra; United States v. Campbell,* 24 B.R. 215 (1943); *United States v. Petty,* 26 B.R. 213 (1943); *United States v. Phillips,* 26 B.R. 299 (1943); *United States v. Murray,* 31 B.R. 389 (1944); *United States v. Bates, supra; United States v. Martin, supra; United States v. Lillis, supra; United States v. Futrell, supra; United States v. Garris,* 48 B.R. 39 (1945); *United States v. Ponsler, supra; United States v. Welch,* 56 B.R. 233 (1945); *United States v. Stanley,* 20 B.R. (ETO) 319 (1945); *United States v. Porter,* 24 B.R. (ETO) 286 (1945); *United States v. Mayfield,* 60 B.R. 179 (1946); *United States v. Hoover,* 3 B.R.J.C. 39 (1949); *United States v. Bazanos,* 8 B.R.J.C. 33 (1950); *United States v. Weller,* 10 B.R.J.C. 381 (1951); *United States v. Pryor,* 2 C.M.R. 365 (A.B.R. 1951); *United States v. Reed,* 9 C.M.R. 269 (A.B.R.1952); *United States v. Atkinson,* 10 C.M.R. 443 (A.B.R.1953); *United States v. Villiados,* 32 C.M.R. 561 (A.B.R.1962); *United States v. Britton,* 13 U.S.C.M.A. 499, 33 C.M.R. 31 (1963); and *United States v. Light,* 36 C.M.R. 579 (A.B.R.1965). For cases prior to 1920, see *Winthrop, supra,* at 716, note 44, and at 727, note 11.

In the third identifiable subheading of these cases, dealing with allegations that an officer "borrowed" money from enlisted persons, the courts again looked to the same types of surrounding conditions as they had looked to in the "gambling" type allegations. See *United States v. Strickland,* 1 B.R. 329 (1930); *United States v. Johnston,* 4 B.R. 211 (1933); *United States v. Sullivan,* 5 B.R. 83 (1934); *United States v. Gould, supra; United States v. Crist,* 12 B.R. 49 (1941); *United States v. Curran,* 15 B.R. 129 (1942); *United States v. Folk,* 15 B.R. 307 (1942); *United States v. Delbrook,* 18 B.R. 29 (1943); *United States v. Addison,* 18 B.R. 171 (1943); *United States v. Brunkella,* 19 B.R. 289 (1943); *United States v. Tillotson,* 20 B.R. 149 (1943); *United States v. Black, supra; United States v. Westcott, supra; United States v. Nelson, supra; United States v. Hart,* 23 B.R. 295 (1943); *United States v. Skeen,* 24 B.R. 373 (1943); *United States v. Peck,* 25 B.R. 205 (1943); *United States v. Churchich,* 26 B.R. 199 (1943); *United States v. Hedgess,* 27 B.R. 223 (1943); *United States v. Bedwell,* 28 B.R. 229 (1943); *United States v. Morrison,* 28 B.R. 355 (1943); *United States v. Benfield,* 29 B.R. 365 (1944); *United States v. Maeef,* 30 B.R. 53 (1944); *United States v. Bohlin,* 30 B.R. 209 (1944); *United States v. Bradford, supra; United States v. Steele,* 30 B.R. 331 (1944); *United States v. Van Epps,* 31 B.R. 193 (1944); *United States v. Young,* 31 B.R. 249 (1944); *United*

*States v. Murray, supra; United States v. Norren, supra; United States v. Clift,* 33 B.R. 263 (1944); *United States v. Elliott,* 34 B.R. 293 (1944); *United States v. Robertson,* 34 B.R. 321 (1944); *United States v. Edwards,* 35 B.R. 143 (1944); *United States v. Sears,* 37 B.R. 39 (1944); *United States v. Lowden,* 39 B.R. 109 (1944); *United States v. Gross,* 39 B.R. 133 (1944); *United States v. Corcoran,* 40 B.R. 235 (1944); *United States v. Allgood,* 40 B.R. 353 (1944); *United States v. Price, supra; United States v. Gilson,* 43 B.R. 235 (1944); *United States v. Hambright,* 5 B.R. (ETO) 287 (1944); *United States v. Collins,* 8 B.R. (ETO) 219 (1944); *United States v. Witmer,* 9 B.R. (ETO) 237 (1944); *United States v. Moore,* 45 B.R. 141 (1945); *United States v. MacDonald,* 46 B.R. 1 (1945); *United States v. McGovern,* 46 B.R. 305 (1945); *United States v. Jamieson,* 47 B.R. 369 (1945); *United States v. Wilson,* 48 B.R. 71 (1945); *United States v. Morris,* 51 B.R. 29 (1945); *United States v. Giardina,* 51 B.R. 291 (1945); *United States v. Murray,* 53 B.R. 93 (1945); *United States v. Phillips,* 55 B.R. 31 (1945); *United States v. Burbank,* 57 B.R. 41 (1945); *United States v. Coates,* 57 B.R. 157 (1945); *United States v. Kuse,* 15 B.R. (ETO) 73 (1945); *United States v. Stanley,* 20 B.R. (ETO) 319 (1945); *United States v. Vollmer, supra; United States v. Porter, supra; United States v. Wickerson,* 25 B.R. (ETO) 295 (1945); *United States v. Powell, supra; United States v. Hicks,* 58 B.R. 139 (1946); *United States v. Zaleski,* 58 B.R. 349 (1946); *United States v. Heaton, supra; United States v. Bryant,* 65 B.R. 119 (1946); *United States v. Sandsness,* 65 B.R. 337 (1946); *United States v. Thomas,* 65 B.R. 57 (1947); *United States v. Dye,* 70 B.R. 385 (1947); *United States v. Fears,* 71 B.R. 37 (1947); *United States v. Lach,* 71 B.R. 303 (1947); *United States v. Vanover,* 79 B.R. 189 (1948); *United States v. Johnson,* 1 B.R.J.C. 343 (1949); *United States v. Wilkins,* 2 B.R.J.C. 153 (1949); *United States v. Cole,* 3 B.R.J.C. 159 (1949); *United States v. Storm,* 11 B.R.J.C. 127 (1951); *United States v. St. Ours,* 6 C.M.R. (A.B.R.1952); *United States v. Rehmann,* 7 C.M.R. 172 (A.B.R.1952); *United States v. Galloway,* 8 C.M.R. 323 (A.B.R.1952); *United States v. Wetzell,* 12 C.M.R. 269 (A.B.R.1953); *United States v. Scioli,* 7 U.S.C.M.A. 502, 22 C.M.R. 292 (1957); *United States v. Calderon,* 24 C.M.R. 338 (A.B.R.1957); *United States v. Burgin,* 30 C.M.R. 525 (A.B.R.1960); *United States v. Villiados, supra;* and *United States v. Light,* 32 C.M.R. 561 (A.B.R.1965). For cases occurring prior to 1920, see *Winthrop, supra,* at 714, note 40, at 715, note 42, and at 716, notes 45 and 46.

And, finally, the fourth subheading deals with those specifications that have alleged an officer has demeaned the respect due him by virtue of his commission, by sexual behavior which a substantial portion of the service's enlisted population required to render this respect deems as scurrilous. See *United States*

## THE SPECIFIC QUESTIONS PRESENTED

Having conclusively established that concepts embodied by the terms "custom of the service" and "fraternization" are irrelevant to the question of whether factually detailed Article 133 or 134 allegations of untoward officer/enlisted behavior are legally sufficient to support such specifications, I strip the specifications, before me, of this surplusage.

Accordingly, the instant specifications become Article 133 allegations that the accused, an unmarried Air Force Captain assigned to Minot Air Force Base, did, at Minot Air Force Base, engage in several acts of sexual intercourse each, with a certain female Air Force Sergeant and with a certain female Air Force Senior Airman.

Accordingly, only two questions are germane to my decision. The first is whether or not existing *stare decisis* identifies multiple acts of fornication by an officer with enlisted personnel as misconduct that is "conduct unbecoming an officer and a gentleman" under Article 133, or, in the alternative, as misconduct that either "prejudices good order and military discipline" or is "service discrediting" under a lesser included Article 134 specification. The second, which must be addressed only if the answer to the first is negative, is whether in the absence of such *stare decisis,* a disciplined analysis of the likely effect of such blatant and casual acts of fornication upon the respect required of enlisted personnel for the commissioned status of all officers, might independently establish that the criteria of an Article 133 offense has been met or, in the alternative, whether a similarly disciplined analysis of the likely effect of such acts upon either the continued mainte-

v. *Kelly,* 11 B.R. 257 (1941); *United States v. Hightower,* 14 B.R. 97 (1942); *United States v. Smith, supra; United States v. Leavit,* 15 B.R. 51 (1942); *United States v. Saul, supra; United States v. Peterson,* 16 B.R. 59 (1942); *United States v. Hathaway,* 14 B.R. 349 (1943); *United States v. Law,* 16 B.R. 117 (1943); *United States v. Samuels,* 22 B.R. 229 (1943); *United States v. Hyre, supra; United States v. Fahey,* 26 B.R. 305 (1943); *United States v. Hooey,* 27 B.R. 5 (1943); *United States v. Fowler,* 27 B.R. 21 (1943); *United States v. Kappes,* 27 B.R. 87 (1943); *United States v. McFarlane,* 28 B.R. 217 (1943); *United States v. Sebastian,* 28 B.R. 267 (1943); *United States v. Breymann,* 50 B.R. 1 (1943); *United States v. Gage, supra; United States v. Suckow,* 2 B.R. (ETO) 199 (1943); *United States v. Cookerly,* 29 B.R. 99 (1944); *United States v. Stone,* 32 B.R. 55 (1944); *United States v. Arnold,* 33 B.R. 69 (1944); *United States v. McCaffree,* 33 B.R. 95 (1944); *United States v. Blanton, supra; United States v. Goggin, supra; United States v. Willetts,* 35 B.R. 231 (1944); *United States v. Gray,* 38 B.R. 109 (1944); *United States v. Kelly,* 39 B.R. 1 (1944); *United States v. Porter,* 39 B.R. 49 (1944); *United States v. Nettles, supra; United States v. Morgan, supra; United States v. Knickerbocker,* 42 B.R. 1 (1944); *United States v. Shipman,* 4 B.R. (ETO) 161 (1944); *United States v. Jared,* 8 B.R. (ETO) 1 (1944); *United States v. Whalen, supra; United States v. Buck, supra; United States v. Long, supra; United States v. Wright, supra; United States v. Futrell, supra; United States v. Wagner,* 48 B.R. 45 (1945); *United States v. Stallworth,* 55 B.R. 97 (1945); *United States v. MacIntyre,* 55 B.R. 151 (1945);

*United States v. Ritner,* 18 B.R. (ETO) 189 (1945); *United States v. Traux,* 27 B.R. (ETO) 25 (1945); *United States v. Pfefferkuch,* 27 B.R. (ETO) 265 (1945); *United States v. Thompson,* 31 B.R. (ETO) 235 (1945); *United States v. Gunning, supra; United States v. Kooch,* 32 B.R. (ETO) 169 (1945); *United States v. Petrie,* 33 B.R. (ETO) 133 (1945); *United States v. Powell, supra; United States v. Peterson,* 59 B.R. 95 (1946); *United States v. Bonet,* 60 B.R. 191 (1946); *United States v. Hart, supra; United States v. Shelton,* 62 B.R. 29 (1946); *United States v. Martin,* 66 B.R. 259 (1947); *United States v. McMillen,* 69 B.R. 113 (1947); *United States v. Slater,* 74 B.R. 371 (1947); *United States v. Rabb, supra; United States v. Crank,* 81 B.R. 289 (1948); *United States v. Prater,* 5 B.R.J.C. 228 (1950); *United States v. Kempe,* 7 B.R.J.C. 101 (1950); *United States v. Clark,* 9 B.R.J.C. 119 (1950); *United States v. Dunlop,* 10 B.R.J.C. 187 (1951); *United States v. Lee,* 4 C.M.R. 185 (A.B.R.1951); *United States v. Jewson,* 7 C.M.R. 213 (A.B.R.1951); *United States v. Livingston, supra; United States v. Cowan,* 12 C.M.R. 374 (A.B.R.1953); *United States v. Rice,* 14 C.M.R. 316 (A.B.R.1953); *United States v. Free, supra; United States v. Yeast,* 36 C.M.R. 890 (A.F.B.R.1965); *United States v. Lovejoy, supra; United States v. Pitasi, supra; United States v. Horton,* 14 M.J. 96 (C.M.A. 1982); *United States v. Newak,* 15 M.J. 541 (A.F.C.M.R.1982); *United States v. Brauchler,* 15 M.J. 755 (A.F.C.M.R.1983); and *United States v. King,* 16 M.J. 990 (A.C.M.R.1983). For cases prior to 1920, *see Winthrop, supra,* at 716, note 44, and at 718, notes 52 and 54.

nance of "good order and discipline" within the Air Force or the continued good will of our nation's civilian population toward the Air Force and its leaders, might independently establish that the criteria of a lesser included Article 134 offense has been met.

## CONCLUSION

It is impossible to review the cases I have cited in the fourth sub-heading of note 15, herein, *supra,* without concluding that the conduct of the accused in this case violated both the Article 133 specification, as alleged, and the lesser included "prejudice to good order and discipline" Article 134 offense, contained within that Article 133 specification. Accordingly, I demur from a more detailed discussion of these cases.

I also recognize that the need for a disciplined analysis of the likely effect of the blatant and casual acts of fornication perpetrated by the accused upon his military inferiors upon the respect required of enlisted personnel for the commissioned status of all officers is mooted by the above conclusion. I, nevertheless, remain so completely appalled by the cavalier attitude of the accused toward the quintessential responsibilities of any commissioned officer and the majority's discipline shattering acquiescence to it, that I am compelled to briefly comment upon those circumstances of this particular case which cause me such concerns.

First, I would point out that there is no other conduct in this nation, which in recent years has generated a more widely divergent and individually self-righteous group of moral attitudes than that related to individual sexual behavior. Indeed, the so-called "Sexual Revolution," has in many instances even pitted individual family member against individual family member in morally devastating conflicts such as have probably been unequalled in this country since the civil war.

Unquestionably, the tide throughout this revolution has been toward a greater and greater tolerance of individual sexual pro-

clivity, and as the majority pointed out, even the former military justice prohibitions against military members fornicating with one another, have been decriminalized. But, to this day, few law abiding activities have been so widely viewed or referred to by various segments of our society as illicit, as, are those instances of sexual conduct between consenting adults that have generally been decriminalized within the last two decades. Indeed, despite the "decriminalization" of such sexual conduct, when it has occurred between people with certain fiduciary type relationships to one another (e.g., professor-student, executive-junior executive, congressman-page) it has resulted more often, than not, in unquestioned dismissals, scholarly advocation of such dismissals,[16] or unprecedented outrage quelling Congressional reprimands.

It is within this emotionally charged arena, that the accused, a commissioned officer in the United States Air Force, first decided for some unknown reason to consciously push against what he believed to be a questionable Air Force taboo, by engaging a variety of young enlisted women in multiple acts of what one of the young women described at trial as "recreational fornication."

Every military officer should immediately recognize that an effective fighting force, which it is their mission to achieve, is absolutely dependent upon the unquestioning obedience of subordinates to command. Further, all military officers should recognize that in order to fulfill their mission of achieving this obedience they must never, knowingly, conduct themselves in a manner that would likely cause even a small portion of their subordinate population to question their moral fiber.

Clearly, it is impossible for an individual officer to obtain the unquestioning obedience of his subordinates if they regard him with moral suspicion or contempt. Accordingly, every military officer is obliged to insure at all times that his or her moral conduct does not fall to a level that might justify such suspicions, even among a small

16. *See Collins,* Managers and Lovers, Harvard   Business Review, Sep-Oct, at 142.

proportion of his subordinate population. The moment such a commissioned officer's observable moral conduct falls to such a level, is the moment he has become a totally ineffective officer.

The moral conduct required of a military officer cannot, therefore, ever be a mere reflection of his own moral values. In point of fact, it cannot even be a reflection of the moral values of a majority of his subordinates. A military leader can simply not be effective when he can only rely on the unquestioning obedience of 60, 70, or even 90 percent of his subordinates. Particularly, in combat situations, where a single disobeyed order can sometimes result in untold horror for obedient individuals, he must command the moral respect of virtually everyone that may be subject to his orders.

Had the accused in the instant case any regard whatsoever for his status as a commissioned officer, he would have immediately recognized that his moral behavior, while perhaps not particularly offensive to him would, nevertheless, have been blatantly offensive to that large group of basically fundamentalist church-goers that populated his, and practically every other base in the Air Force (and, some of which undoubtedly were directly subordinate to him). Lacking this regard for his commission, he instead, consciously destroyed not only his own effectuality, but risked the possibility that the emotion charged moral indignation he had aroused might be transferred by these people to other military officers.

Similarly, by violating his fiduciary-like duty to the moral well-being of his enlisted subordinates [17] he risked subjecting the service to public moral condemnation similar to that which would recently have beset our Congress, had the House of Representatives chosen not to reprimand its members who offended public mores in a similar manner.

Contrary to the overriding concern of the majority, I see no similarity, whatsoever, between the accused's conduct in this case and the conduct of a married officer who engages in sexual relations with his or her enlisted spouse. Here the accused's conduct was actionable because he should have recognized that recreational fornication with a variety of enlisted personnel is still viewed as immoral and promiscuous by a substantial minority of Air Force enlisted personnel, and that he could not effectively function as an Air Force officer, once such a substantial minority of his subordinates had developed a contemptuous suspicion concerning his moral uprightness. Such conduct on the accused's part clearly amounted to conduct unbecoming an officer and conduct prejudicial to good order and discipline.

I cannot think of a single Air Force group or person that would be offended by an Air Force officer having sex with his or her spouse, nor can I think of a single instance in which such conduct could be said to amount to conduct unbecoming an officer or conduct prejudicial to good order and discipline.

I would affirm the findings and the sentence as adjudged.

---

17. See Executive Order 10013, 27 October 1948, as amended by Executive Order 10043, 10

March 1949. See also AFR 50–31, Moral Leadership, 24 October 1969, and its predecessors.